**TENNESSEE ASPHALT COMPANY, et al., Plaintiffs–Appellants,**

**v.**

**Robert E. FARRIS, et al., Defendants–Appellees.**

No. 90–5945.

United States Court of Appeals, Sixth Circuit.

Argued May 20, 1991.

Decided Aug. 22, 1991.

Richard J. Braun, Thompson & Bussart, Nashville, Tenn., Charles F. Barnett, Jr. (argued and briefed), Cordell M. Parvin, Parvin, Wilson, Barnett & Hopper, Roanoke, Va., for plaintiffs-appellants.

Charles W. Burson, Atty. Gen., Michael W. Catalano, Deputy Atty. Gen. (argued and briefed), Nashville, Tenn., John R. Dunne, Louise A. Lerner (briefed), U.S. Dept. of Justice, Civ. Rights Div., Appellate Section, John Payton, James W. Cooper, Wilmer, Cutler & Pickering, Washington, D.C., for defendants-appellees.

David K. Flynn, Washington, D.C., for Adm'r. of Fed. Highway Admin., Secretary of U.S. Dept. of Transportation and Comm'r of the State of Tenn. Dept. of Transp.

Before JONES and NORRIS, Circuit Judges, and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

This case involves affirmative action and a claim of "reverse discrimination." More specifically, it requires us to determine the constitutionality of a federal statute and federal regulations granting preferential treatment to "disadvantaged business enterprises," (DBE) as applied by the Tennessee Department of Transportation (TDOT) in awarding federal-aid contracts for highway construction. The district court found no constitutional infirmities in the set-aside program as administered by TDOT and granted summary judgment in favor of the defendants. The plaintiffs appealed, and we affirm.

I.

The plaintiffs are Tennessee Asphalt Company, Tennessee Road Builders Associ-ation and six highway construction subcontractors. The defendants are Robert E. Farris, Commissioner of TDOT, the Secretary of the United States Department of Transportation and the Administrator of the Federal Highway Administration (FHWA). The plaintiffs contend that TDOT has applied section 105(f) of the Surface Transportation Assistance Act of 1982 (the Act), Pub.L. No. 97–424, 96 Stat. 2097, 2100 (1983), in an unconstitutional manner. Section 105(f) provides:

> Except to the extent that the Secretary determines otherwise, not less than 10 per centum of the amounts authorized to be appropriated under this Act shall be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals as defined by section 8(d) of the Small Business Act (15 U.S.C. section 637(d)) and relevant subcontracting regulations promulgated pursuant thereto.

Section 105(f)'s implementing regulations, contained in 49 C.F.R. Part 23, Subpart D, require recipients of funds under the Act to set annual goals for DBE participation. 49 C.F.R. § 23.64. A recipient state may request an annual goal below 10% when justification, such as limited availability of minority enterprises, is documented along with the state's other efforts to meet the 10% goal. See 49 C.F.R. §§ 23.64 & 23.65. The recipient state is required to set a minimum level of DBE participation on each contract that the state intends to use to meet its overall goal. 49 C.F.R. § 23.-45(g). Projects may be awarded to bidders failing to meet a DBE project goal but able to demonstrate good faith efforts to obtain DBE participation. 49 C.F.R. § 23.45(h)(2). The regulations provide guidance as to factors that may be considered by a recipient state in evaluating a bidder's good faith efforts. Appendix A to Subpart C of 49 C.F.R. § 23.45 lists nine "kinds of efforts that recipients may consider" in evaluating good faith efforts. These factors are "not intended to be a mandatory checklist ... [n]or is the list intended to be exclusive or exhaustive."[1] A state may be excused for falling short of its annual DBE goal if the state awards contracts to bidders who ob-

---

[1]. These considerations are made applicable to contracts awarded under 49 C.F.R. Part 23, Sub-part D, as in the case at bar, by Appendix A to 49 C.F.R. Part 23, Subpart D.

tain a good faith efforts waiver on a project. 49 C.F.R. Part 23, Subpart D Appendix A (discussing 49 C.F.R. § 23.68).

The Act expired by its own terms in 1986 and was replaced in 1987 by the Surface Transportation and Uniform Relocation Assistance Act of 1987 (STURAA), Pub.L. No. 100–17, 101 Stat. 132 (1987). Section 106(c) of STURAA contains a set-aside provision substantially similar to section 105(f) of the Act. The only notable difference between STAA and STURAA is that the latter includes female-owned businesses as DBEs. The regulations under STURAA remain the same as under STAA.

As a recipient of federal-aid highway construction funds, TDOT has implemented a DBE program by means of Special Provision 1247. Special Provision 1247 is incorporated into all TDOT federal-aid highway contracts that have DBE subcontractor goals. TDOT established a 10% goal for the years 1984–1986. TDOT advises prime contract bidders of the DBE subcontract bid requirements in bid specifications issued for each project. Special Provision 1247 lists a number of factors and "additional documentation" that are "illustrative of factors which are considered in judging whether the bidder has made adequate good faith efforts" to obtain DBE subcontractor participation. These factors become critical when a prime contractor has failed to satisfy a specific project's DBE goal and therefore seeks shelter under the good faith efforts exemption contained in § 23.45(h)(2) of the federal regulations. Factors 6 and 7 were added to Tennessee's Special Provision 1247 in October and November of 1984 as additional illustrations of good faith factors and provide as follows:

(6) Whether the bidder achieved a percentage of DBE participation equal to or greater than competing bidders who have submitted reasonable bids.

(7) Whether the bidder submitted all quotations received from DBE's, and for those quotations not accepted, an explanation of why the DBE was not accepted including price comparisons. Receipt of a lower quotation from a non-DBE will not in itself excuse a bidder's failure to meet contract goals.

It was stipulated that both of these factors were added to Special Provision 1247 in response to letters received by TDOT from the Tennessee Division Administrator of the FHWA, and that TDOT believed that the FHWA would not concur in TDOT's contract awards if it failed to comply with the FHWA's recommendation to add these factors to Special Provision 1247.

In addition to arguing that, as applied by TDOT, section 105(f) and the regulations violate the Equal Protection Clause of the Fourteenth Amendment, the plaintiffs assert that the implementation of the set-aside program by TDOT is in conflict with the competitive bidding requirements of the Federal Highway Act, which provides as follows:

Contracts for the construction of each project shall be awarded only on the basis of the lowest responsive bid submitted by a bidder meeting established criteria of responsibility. No requirement or obligation shall be imposed as a condition precedent to the award of a contract to such bidder for a project, or to the Secretary's concurrence in the award of a contract to such bidder, unless such requirement or obligation is otherwise lawful and is specifically set forth in the advertised specifications.

23 U.S.C. § 112(b) (1988).

## II.

The district court entered its first summary judgment for the defendants in 1987. While the plaintiffs' appeal was pending the Supreme Court decided *City of Richmond v. J. A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). Because that decision dealt with a set-aside program by a local government and appeared to announce new criteria for determining the constitutionality of affirmative action programs of states and their political subdivisions, we remanded this case to the district court for reconsideration in light of *Croson*. 883 F.2d 76. Following remand, the district court considered the effect of *Croson* and concluded that its original deci-

sion was correct and that *Croson* did not require a different result. The district court again granted summary judgment for the defendants and filed an opinion explaining its understanding of *Croson* and its reasons for concluding that *Croson* did not mandate a finding that TDOT's implementation of section 105(f) and the regulations infringed the plaintiffs' constitutional rights. The court also adhered to its original holding that Factors 6 and 7 of Special Provision 1247 do not violate the competitive bidding requirement of the Federal Highway Act.

In this appeal the plaintiffs concede the facial validity of section 105(f) and the regulations, and limit their constitutional challenge to TDOT's program as applied. They argue, in effect, that TDOT's adherence to the 10% set-aside prescribed by section 105(f) without evidence of past discrimination by Tennessee was an equal protection violation under *Croson,* and that the adoption of Factors 6 and 7 "turned the DBE program in Tennessee into a far more race-conscious program than it had previously been. The practical effect was to turn a 'goal' program into a quota." (Supp. Br. at 16).

The defendants respond that the State of Tennessee acts as the agent of the United States in applying congressionally mandated requirements to its highway construction programs that are carried out, in part, with federal financing. This being so, the defendants argue, this case is controlled by *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) and *Metro Broadcasting, Inc. v. F.C.C.,* — U.S. —, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990). In addition, the defendants assert that Factors 6 and 7 are interpretive, not substantive rules, and that they impose no new obligations on bidders. Thus, they contend that the "factors" have no constitutional significance and do not violate the competitive bidding requirements of the Federal Highway Act.

### III.

From the number of opinions issued in each such case, it appears that litigation involving affirmative action programs of governmental units and public bodies has been among the most troublesome considered by the Supreme Court over the past decade. Although all members of the Court appear to agree that race-conscious programs of every kind are subject to heightened scrutiny, there appears to be no agreement on the exact level of scrutiny required. In the absence of bright lines, our task is to determine what case or group of cases from the Supreme Court most nearly fits the scenario of the particular case before us.

The parties agree that the two cases most critical to our decision are *Fullilove* and *Croson.* The defendants argue that these Supreme Court decisions announce different standards, according to whether the initiating governmental body is the Congress of the United States or is some state or local governmental entity. The plaintiffs, on the other hand, maintain that *Fullilove* and *Croson* are not in conflict and that *Croson* is a refinement of *Fullilove.* They say that under *Croson* a state must make independent findings that its own agencies have been guilty of past discrimination before imposing the 10% requirement of section 105(f) on prime contractors bidding upon highway projects. They emphasize that there are so few minority prime contractors, that the entire set-aside, as a practical matter, must be satisfied by choosing subcontractors on the basis of race. This, they argue, places an unacceptable burden on non-minority subcontractors.

### IV.

In *Fullilove* the Supreme Court held that the "minority business enterprise" (MBE) provision of the Public Works Act of 1977 did not violate the Equal Protection Clause. The 1977 Act is similar to the two statutes in dispute in the present case. It requires, absent an administrative waiver, that at least 10% of federal funds granted for local public works be used by the state or local grantee of the funds to procure services or supplies from businesses owned by mem-

bers of minority groups, as defined in that Act.

### A.

Chief Justice Burger, in an opinion for himself, Justice White and Justice Powell, emphasized the broad authority of Congress under the Spending Power provisions and the Commerce Clause of the Constitution to provide a safeguard against federal funds being used to perpetuate the effects of prior discrimination that had largely excluded minority businesses from public contracts. The Chief Justice also made clear that Congress could have achieved its objectives by proceeding under section 5 of the Fourteenth Amendment, which grants Congress the power " 'to enforce by appropriate legislation,' the equal protection guarantees" of that amendment. 448 U.S. at 476, 100 S.Ct. at 2773.

It made a difference, the plurality stated, that the Court was not dealing with a remedial decree of a court but with the legislative authority of Congress. *Id.* at 483, 100 S.Ct. at 2777. The Courts have limited remedial powers while Congress has a much broader scope. "It is fundamental that in no organ of government, state or federal, does there repose a more comprehensive remedial power than in the Congress, expressly charged by the Constitution with competence and authority to enforce equal protection." *Id.* Discussing the means by which Congress may exercise its remedial powers, the Chief Justice wrote:

> Congress not only may induce voluntary action to assure compliance with existing federal statutory or constitutional anti-discrimination provisions, but also, where Congress has authority to declare certain conduct unlawful, it may, as here, authorize and induce state action to avoid such conduct.

*Id.* at 483–84, 100 S.Ct. at 2777.

### B.

The nonminority contractors in *Fullilove* argued, as the plaintiffs do here, that the set-aside program deprived them of business opportunities even though they were innocent of prior discriminatory acts. The plurality opinion responded that "a sharing of the burden" by innocent parties is not impermissible where the remedy is limited and "properly tailored." *Id.* at 484, 100 S.Ct. at 2778. It was within Congress' power "to act on the assumption that in the past some nonminority businesses may have reaped competitive benefit over the years from the virtual exclusion of minority firms from these contracting opportunities." *Id.* at 485, 100 S.Ct. at 2778.

The opinion also found it "significant" that the administrative scheme under the MBE program contained provisions for waiver and exemption. *Id.* at 487, 100 S.Ct. at 2779. The assumptions upon which Congress acted were thus subject to rebuttal in the administrative process. *Id.* A local grantee who proved that bona fide minority contractors were unavailable to provide services or supplies equal to 10% of the federal funds involved in a public contract would be relieved of the set-aside obligation. *Id.* at 488, 100 S.Ct. at 2780.

In a concurring opinion, Justice Powell also emphasized the significance of the fact that it was the "National Legislature," rather than a state or local governmental entity that had prescribed the remedy for a constitutional violation. 448 U.S. at 499, 100 S.Ct. at 2785 (Powell, J., concurring). Justice Powell concluded that Congress is competent to make findings of unlawful discrimination and to address such discrimination, where so identified, by selecting "reasonable remedies to advance the compelling state interest in repairing the effects of discrimination." *Id.* at 510, 100 S.Ct. at 2791. Justice Marshall also concurred separately in an opinion joined by Justices Brennan and Blackmun.

### V.

*Fullilove* concerned a federal set-aside program, instituted by Congress. On the other hand, *Croson* dealt with an attempt by a political subdivision of a state to deal with past and present racial discrimination as perceived by a city council.

## A.

The issue in *Croson* was the extent to which a city may seek to ameliorate the effects of past discrimination and eliminate ongoing discrimination within its jurisdiction by means of a program that gives preferential treatment to minority contractors seeking public jobs. Justice O'Connor, in a plurality opinion, made it clear, that based upon sufficient findings a state or political subdivision has the power "to eradicate the effects of private discrimination within its own legislative jurisdiction." 488 U.S. at 491–92, 100 S.Ct. at 2781–82 (footnote omitted). Governmental entities are not restricted to eradicating the effects only of their own discriminatory acts. However, the court found in *Croson* that the "factual predicate" for the city's action suffered from the "fatal defects" of generalized findings of past discrimination in the construction industry without any direct evidence even "approaching a prima facie case of a constitutional or statutory violation by *anyone* in the Richmond construction industry." *Id.* at 498, 500, 100 S.Ct. at 2785, 2786 (italics in original).

*Croson* followed and reaffirmed the basic holding of the Court in *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1989). Also in a plurality opinion, Justice Powell wrote in *Wygant* that racial classifications can be justified as a remedy for discrimination only to further a compelling governmental interest. *Id.* at 274, 106 S.Ct. at 1847. In addition, any race-conscious remedy chosen by the state or other local governmental unit must be " 'narrowly tailored to the achievement of that goal.' " *Id.* (citation omitted). Justice Powell also stated that only proof of discrimination within the governmental unit imposing the remedy will justify a racial preference; "societal discrimination" alone will not justify the use of racial classifications. *Id.* at 276, 106 S.Ct. at 1848.

## B.

Justice O'Connor spent much of the first 20 pages of her opinion in *Croson* distinguishing *Fullilove.* She emphasized the broad remedial powers of Congress as contrasted with the limited powers of state and local governments in formulating race-conscious remedies for past and present discrimination. This difference is based on the structure of the Fourteenth Amendment. Section 1 is a limitation on the power of the states ("nor [shall any State] deny to any person within its jurisdiction the equal protection of the laws."). Section 5, on the other hand, grants specific powers to the National Legislature ("The Congress shall have power to enforce, by appropriate legislation, the provisions of this article [the amendment]."). 448 U.S. at 490–91, 100 S.Ct. at 2780–81. Because *Fullilove* was based on an exercise by Congress of its positive power under section 5, that decision is not dispositive of cases such as *Wygant* and *Croson* where a governmental unit is operating under the constraints of section 1.

The *Croson* plurality opinion recognized that "Congress need not make specific findings of discrimination to engage in race-conscious relief." *Id.* at 489, 100 S.Ct. at 2780. But, the fact that "Congress may identify and redress the effects of society-wide discrimination does not mean that, *a fortiori,* the States and their political subdivisions are free to decide that such remedies are appropriate." *Id.* at 490, 100 S.Ct. at 2780–81. Rather, the States and lesser units of local government are limited to remedying sufficiently identified past and present discrimination within their own spheres of authority.

In its most recent pronouncement on the subject of race-conscious remedies by governmental units, the Supreme Court again drew the distinction between programs mandated by Congress and those undertaken by states and other local governmental entities. *Metro Broadcasting, Inc. v. F.C.C.,* supra. Noting the congressional action was not before the Court in *Croson,* Justice Brennan wrote for the *Metro Broadcasting* majority—

and so *Croson* cannot be read to undermine our decision in *Fullilove.* In fact, much of the language and reasoning in *Croson* reaffirmed the lesson of *Fulli-*

*love* that race-conscious classifications adopted by Congress to address racial and ethnic discrimination are subject to a different standard than such classifications prescribed by state and local governments.

110 S.Ct. at 3009.

## VI.

We conclude that our decision in the present case is controlled by *Fullilove* and not by *Croson* and *Wygant*.

### A.

The highway construction set-aside program is Congress' initiative designed to ameliorate the effects of past and present discrimatory restrictions on opportunities for minority road contractors to participate in a sphere of publicly-funded activity that exists at every level of government. The structure of the Act makes it virtually impossible for a state to carry on a comprehensive highway construction and maintenance program without abiding by the set-aside requirements of section 105(f).

■ Employing its powers under section 5 of the Fourteenth Amendment, Congress can legitimately use this "carrot and stick" approach to engage the states and their political subdivisions in its efforts to remedy society-wide discrimination. *Fullilove* makes this clear, and both *Croson* and *Wygant* recognize this congressional power. The plaintiffs in the present case argue that Tennessee violates section 1 of the Fourteenth Amendment by participating in this federally initiated preferential scheme without making the "particularized findings" of discrimination required for a race-conscious program to be initiated by a state or local government. We disagree. This assertion was answered by Judge Posner in *Milwaukee County Pavers Ass'n v. Fielder*, 922 F.2d 419 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2261, 114 L.Ed.2d 714 (1991), where he described the "joint lesson of *Fullilove* and *Croson*" to be—

> that the federal government can, by virtue of the enforcement clause of the Fourteenth Amendment, engage in affirmative action with a freer hand than states and municipalities can do. And one way it can do that is by authorizing states to do things that they could not do without federal authorization.

*Id.* at 423–24.

■ We agree with the court in *Milwaukee Pavers* that the proper characterization of a state's role under the Act is the basic question presented by these nonminority contractors' appeals. We have concluded that Congress has the power to enact the Act, including its 10% set-aside requirement under *Fullilove*. Further, while it is true that Tennessee may opt not to participate in the federal program at all, if the state decides to accept highway funds, it must meet the 10% DBE requirement, or fulfill the federal requirements for a variance by showing 10% participation is not possible despite good faith efforts. In other words, and contrary to the plaintiffs' frequent assertions, Tennessee has no discretion to *either* accept the 10% DBE requirement *or* apply for a variance. Rather, it may only apply for a variance by establishing under federal standards that it cannot comply with the 10% requirement. Thus, every aspect of participation in the federal highway program is mandated by Congress. And, since "Congress [can] mandate state and local compliance with [a] set-aside program under its § 5 power to enforce the Fourteenth Amendment," *Croson*, 488 U.S. at 487, 109 S.Ct. at 718, a state's compliance with the mandates of a federal scheme is nothing more than compliance with federal law.

### B.

■ We recognize that *Fullilove* arose from a claim of facial unconstitutionality of an act of Congress whereas the plaintiffs in this case concede the facial constitutionality of the Act, and charge the defendants with unconstitutional application of the Act and regulations. Our plaintiffs argue that, unlike the construction industry in general, highway construction has no private sector. A highway contractor either works on public projects or has no work. The district court noted this argument, but found that

the nonminority subcontractors who testified and submitted evidence had actually experienced continuing growth in their businesses in the years that Tennessee has participated in the congressionally-mandated set-aside program. There is no evidence that "innocent parties" have suffered any greater hardship under Tennessee's application of section 105(f) than the contractors who were affected by the MBE program upheld by the Supreme Court in *Fullilove*. If the plaintiffs had additional evidence on this issue, it was their responsibility to present it to the district court in response to the defendants' motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Instead, the plaintiffs filed a cross-motion for summary judgement, thus submitting the case for final disposition on the record as then made. In view of the fact that the plaintiff did not adduce evidence of an impermissible impact on them and their fellow nonminority contractors sufficient to create a genuine issue of material fact, the district court properly granted the defendants' motion for summary judgment.

■ We also reject the plaintiffs' arguments with respect to special Factors 6 and 7. We do not view the adoption of these illustrative examples of factors to be considered in determining the legitimacy of a bidder's claim of good faith efforts to achieve the 10% goal of section 105(f) as an added intrusion by the state. These factors were adopted by the defendants in response to federal urgings and they do not impose any requirements on bidders beyond those imposed by the Act itself. They create no preference for DBEs beyond that created by the federal program. The adoption of Factors 6 and 7 did not violate the Equal Protection Clause, as claimed by the plaintiffs.

Nor do Factors 6 and 7 conflict with the competitive bidding requirements of 23 U.S.C. § 112(b). Under § 112(b), a bid must be "responsive" in order to be eligible for a contract award. A bid for federal-aid highway construction work may be "responsive" under § 105(f) and its regulations if it either (1) satisfies the project DBE participation goal or (2) fails to satisfy the project DBE goal but demonstrates the existence of good faith efforts to satisfy the project goal. Factors 6 and 7 apply only when "responsiveness" hinges on a determination of a bidder's good faith efforts. In this circumstance, Special Provision 1247 lists seven factors intended to provide bidders with illustrations of the type of considerations upon which a good faith efforts determination pivots. Factors 6 and 7 are only two of those illustrations.

Plaintiffs contend that Factors 6 and 7 violate § 112(b) by rendering the bid evaluation process unacceptably arbitrary and subjective. "Good faith efforts" is an inherently subjective concept. When the illustrations provided by Special Provision 1247 are examined as a whole, the character of Factors 6 and 7 is not fundamentally distinguishable from the other five illustrations. Thus, bidders understand more of what is required by "good faith efforts" by virtue of each illustration provided. Factors 6 and 7 are no exception. As a group, these factors diminish the subjectivity associated with a good faith efforts determination and thereby assist bidders in understanding what is required of them in order to submit a "responsive" bid.

Plaintiffs' contention that these factors functionally require bidders to satisfy the project goal regardless of their efforts to obtain DBE participation is unpersuasive. A bid may continue to be "responsive" solely by virtue of a bidder's good faith efforts. The factors merely emphasize what is required to meet this standard.

### Conclusion

We have not discussed every argument made by the plaintiffs because some of them do not address the issues that must be settled to reach a decision in this case. The fundamental question raised by this appeal is answered by our determination that the Supreme Court has carefully distinguished between the limitations on efforts of states and their political subdivisions to employ race-conscious remedies to overcome the effects of past and present

discrimination and the broader power of Congress to address such problems on a nationwide basis. Founded as it is, on the dual purposes of the Fourteenth Amendment as shown in sections 1 and 5, this distinction controls our decision in the present case.

The judgment of the district court is affirmed.