981 F.2d 50
 60 Empl. Prac. Dec. P 41,927, 61 USLW 2384
 HARRISON & BURROWES BRIDGE CONSTRUCTORS, INCORPORATED;
Laquidara, Incorporated, Plaintiff-Appellant,
v.
Mario M. CUOMO, as Governor of the State of New York;
Franklin E. White, as Commissioner of the New York State
Department of Transportation; Darrell W. Happ; Kenneth W.
Shiatte; Steven F. Lewis, individually and as officials of
the New York Department of Transportation, Defendants-Appellees,
v.
UNITED STATES DEPARTMENT OF TRANSPORTATION,
Intervenor-Defendant-Appellee.
UNITED FENCE & GUARD RAIL CORPORATION, Plaintiff-Appellant,
v.
Mario M. CUOMO, Individually and as Governor of the State of
New York; Franklin E. White, individually and as
Commissioner of Transportation of the State of New York,
Horace M. Flowers, Individually and as Director of the
Office of Equal Opportunity Development and Compliance of
the New York Department of Transportation; Howard L.
Sheffey, Individually and as Director of the Affirmative
Action Programs Office of the New York Department of
Transportation, Defendants-Appellees.
 Nos. 1055, 1059, Dockets 91-9090, 91-9098.
 United States Court of Appeals,
Second Circuit.
 Argued March 2, 1992.
Decided Dec. 2, 1992.
 
 Harry R. Hayes, III, Albany, N.Y. (Hayes & Hayes, Albany, N.Y., Martin S. Kaufman, Atlantic Legal Foundation, New York City, of counsel), for plaintiffs-appellants.
 Sanford M. Cohen, Asst. Atty. Gen. in Charge, Civ. Rights Bureau, New York City (Robert Abrams, Atty. Gen. of the State of N.Y., New York City, of counsel), for defendants-appellees.
 David K. Flynn, Civ. Rights Div., U.S. Dept. of Justice, Washington, D.C. (Frederick J. Scullin, Jr., U.S. Atty., Arthur J. Rothkopf, Gen. Counsel, Paul M. Geier, Asst. Gen. Counsel for Litigation, Robert W. Ferguson, Trial Atty., Office of Gen. Counsel, U.S. Dept. of Transp., John R. Dunne, Asst. Atty. Gen., David O. Simon, Acting Deputy Asst. Atty. Gen., Louise A. Lerner, Civ. Rights Div., U.S. Dept. of Justice, Washington, D.C., of counsel), for Federal appellee.
 Before CARDAMONE and ALTIMARI, Circuit Judges, and CONNER, District Judge.*
 CARDAMONE, Circuit Judge:
 
 
 1
 Fifteen years ago Congress passed the Public Works Employment Act of 1977. That Act contained a provision setting aside ten percent of its funds to be allocated to minority businesses. The Act withstood a constitutional challenge several years later when the Supreme Court held that this affirmative action provision was not reverse discrimination in disguise. The Court stated that nothing in the Constitution required that government actions always be color-blind, and that race-based relief may be appropriate so long as government actions are narrowly tailored to remedy factually demonstrated, identifiable past discrimination. See Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). Subsequent federal statutes carried forward the minority set-aside scheme when federal funds were used to aid state highway construction. New York, along with other states, enacted laws similar to the federal model for state highway projects funded entirely by state funds.
 
 
 2
 Appellants are two New York corporations, both wholly-owned by white males, that have brought suit against New York state officials charging that these federal and state statutes in effect mandate quotas and, as applied, have deprived them of contracts for highway construction that they had bid on and reasonably anticipated being awarded, and that instead were awarded to a handful of certified minority enterprises.
 
 
 3
 Their appeal challenges the constitutionality of the federal set-aside program on state highway construction using federal funds and also challenges New York's law providing a similar set-aside for minority enterprises covering wholly state-funded highway projects. Specifically, appellants allege that these statutes have denied them the equal protection of the laws.
 
 
 4
 One appellant is United Fence and Guard Rail Corporation (United Fence), a Ronkonkoma, New York corporation engaged in the sale and installation of guardrails, signs, fences and related products on highway and bridge projects. It regularly quotes prices as a subcontractor to prime contractors bidding on New York Department of Transportation (NYDOT) construction projects. The other appellant is Harrison and Burrowes Bridge Constructors, Inc. (Harrison), a Glenmont, New York corporation engaged in rehabilitating and constructing bridges. It regularly submits bids as a prime contractor on NYDOT projects.
 
 
 5
 The United States District Court for the Northern District of New York (McCurn, C.J.) dismissed on the merits both appellants' equal protection attacks to NYDOT's implementation of the federal set-aside program. It also dismissed the objections to the state set-aside program as moot, to the extent that declaratory and injunctive relief was sought, and dismissed plaintiffs' 42 U.S.C. § 1983 claims for damages against various named state officials as barred by qualified immunity. For the reasons discussed below, we affirm.
 
 BACKGROUND
 Federal Program
 
 6
 The first issue appellants raise concerns the federally authorized set-aside program implemented by New York. That program originated in 1983 after Congress enacted a five-year transportation act entitled the Surface Transportation Assistance Act of 1982 (Surface Transportation Act), Pub.L. No. 97-424, 96 Stat. 2097 (1983), § 105(f) of which provides,
 
 
 7
 [e]xcept to the extent that the Secretary [of Transportation] determines otherwise, not less than 10 per centum of the amounts authorized to be appropriated under this Act shall be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals [disadvantaged business enterprises] as defined by section 8(d) of the Small Business Act (15 U.S.C. § 637(d) [ (1988) ] and relevant subcontracting regulations promulgated pursuant thereto.
 
 
 8
 96 Stat. at 2100. Section 8(d) of the Small Business Act states it is the policy of the United States that disadvantaged business enterprises (minority businesses) "have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency" and creates a presumption of such status in favor of "Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities." 15 U.S.C. § 637(d) (1988).
 
 
 9
 After the Surface Transportation Act funding expired five years later, Congress enacted the Surface Transportation and Uniform Relocation Assistance Act of 1987 (Act or Surface Relocation Act), Pub.L. No. 100-17, 101 Stat. 132 (1987). The two statutes were designed to achieve stated minority business participation goals primarily through the use of set-asides for qualified subcontractors. See S.Rep. No. 4, 100th Cong., 1st Sess. 11-12 (1987), reprinted in 1987 U.S.C.C.A.N. 66, 76. Section 106(c) of the Surface Relocation Act established a ten percent minority businesses goal similar to that in the Surface Transportation Act, 101 Stat. at 145, and added Women-owned Business Enterprises (women-owned businesses) to the presumptive group of minority enterprises. 101 Stat. at 146.
 
 
 10
 The United States Department of Transportation (USDOT) promulgated detailed regulations to implement the Surface Transportation Act § 105(f). 49 C.F.R. pt. 23 subpart D (1991); 48 Fed.Reg. 33,442 (1983). After passage of this Act, subpart D was amended to reflect the inclusion of women-owned enterprises as presumptive disadvantaged businesses. 49 C.F.R. § 23.62 (1991); 52 Fed.Reg. 39,230 (1987). The implementing regulations define a disadvantaged enterprise as a small business concern (within the meaning of § 3 of the Small Business Act, 15 U.S.C. § 632 (1988)), that is at least 51 percent owned by one or more socially and economically disadvantaged individuals and whose management and daily business operation is controlled by one or more of those owners. 49 C.F.R. § 23.62. These regulations establish a rebuttable presumption that women, Black Americans, Hispanics, Native Americans, Asian-Pacific Americans, Asian-Indian Americans and those individually certified as minority enterprises under § 8(a) of the Small Business Act, 15 U.S.C. § 637(a), are socially and economically disadvantaged. 49 C.F.R. § 23.62. Other individuals may be so classified under certain conditions, see 49 C.F.R. pt. 23 subpart D, and individuals presumptively considered socially and economically disadvantaged may lose that classification upon challenge by a third party. 49 C.F.R. § 23.69 (1991).
 
 
 11
 The states become involved because recipients of federal funds under either of the federal surface transportation statutes must comply with USDOT regulations concerning minority business participation, that is, a state recipient must establish annual overall minority enterprise participation goals on projects receiving federal funds, 49 C.F.R. § 23.64 (1991), and must ensure that at least ten percent of monies expended on federally-assisted projects go to such enterprises, absent a waiver by the Secretary of Transportation. 49 C.F.R. §§ 23.61(a), 23.63 (1991). The regulations specify how a state sets its annual goal, see 49 C.F.R. § 23.45(g) (1991), and provide that failure to meet an annual goal may be excused upon adequate explanation. 49 C.F.R. § 23.68(c) (1991).
 
 
 12
 USDOT regulations also require participating states to set individual contract minority enterprise participation goals, 49 C.F.R. § 23.45(g)(2), and regulations detail certain factors to be considered in setting individual contract goals, see 49 C.F.R. § 23.45(g)(1), (7), (8). The regulations further provide that a prime contractor unable to satisfy a particular contract's minority set-aside goal may nevertheless be awarded the contract if its "best efforts" were made to meet the goal. 49 C.F.R. §§ 23.45(g)(2)(ii), 23.45(h). Several elements are considered in determining whether a prime contractor failing to meet its goal in fact made a good faith effort to comply. See 49 C.F.R. § 23.45, app. A.
 
 
 13
 The NYDOT accordingly adopted a minority enterprise plan it implements on highway projects receiving federal funds. See N.Y. High. Law § 85 (Consol.Supp.1991); N.Y.Transp.Law § 428(1) (Consol.Supp.1991); N.Y.C.C.R.R. tit. 17, pt. 35 (1992). The NYDOT plan tracks the federal regulations and conforms to them in all significant respects. The USDOT approved the NYDOT's annual minority enterprises set-aside goal of 17 percent for fiscal years 1988, 1989, and 1990.
 
 State Program
 
 14
 Effective July 19, 1988 New York enacted its own comprehensive program designed to increase the participation of minority-owned business enterprises and women-owned enterprises on contracts awarded by state agencies, including those awarded by the NYDOT. See N.Y.Exec.Law Art. 15-A, §§ 310-318 (Consol.Supp.1991). Article 15-A does not apply to NYDOT's implementation of the federal minority enterprises program; the above cited regulations at N.Y.C.C.R.R. tit. 17, pt. 35 (1992) therefore also do not apply to state-funded contracts. See Art. 15-A, § 313(3). The state program defines minority enterprises as businesses at least 51 percent owned and operated by Blacks, Hispanics, Native American or Alaskan natives, or Asian and Pacific Islanders. Id. § 310(7), (8). Women-owned enterprises must be 51 percent owned and operated by women. Id. § 310(15). (Both women-owned and minority-owned businesses will be hereafter collectively referred to as disadvantaged enterprises where appropriate).
 
 
 15
 Article 15-A also established the Office of Minority and Women's Business Development (state disadvantaged business development agency or the agency) and empowered the director of that agency to promulgate regulations. Id. §§ 311(1), 313(1). The regulations promulgated pursuant to article 15-A, see N.Y.C.C.R.R. tit. 9, pts. 540-44 (1992), require all state agencies to submit plans setting annual and individual contract disadvantaged enterprises participation goals to the director of the agency. See id. §§ 541.2, 543.2. The same state statute directs contractors bidding on state contracts to submit a utilization plan outlining disadvantaged business participation, see art. 15-A §§ 310(9), 313(4), and requires that bidders make good faith efforts to comply with the disadvantaged enterprise goals set for a particular contract. See id. § 313(5). The state program and implementing regulations are set out in greater detail in Harrison & Burrowes Bridge Constructors v. Cuomo, 743 F.Supp. 977, 979-82 (N.D.N.Y.1990), and need not be repeated here.
 
 
 16
 The Supreme Court's recent decision in City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), raised red flags of doubt concerning the constitutionality of state set-aside programs like that adopted by New York. As a result of this uncertainty, article 15-A and its implementing regulations were preliminarily enjoined. See Harrison & Burrowes, 743 F.Supp. at 1002. On July 20, 1990 the director of the state minority business development agency promulgated a temporary emergency amendment to the regulations issued under 15-A, which in effect suspended enforcement of the requirement that contractors make good faith efforts to comply with the disadvantaged enterprise goals on state-funded contracts. The final rule--N.Y.C.C.R.R. tit. 9, § 543.2(c)--now provides that any requirement to make good faith efforts to meet disadvantaged enterprise participation goals on state-funded contracts will not be enforced until the agency determines that a firm basis in fact exists for believing that (a) as to minority enterprises, a compelling state interest supports the participation goals; and (b) as to women-owned enterprises, a constitutionally-sufficient state interest supports the goals. The state has not since July 20, 1990, enforced the good faith effort requirement.
 
 FACTS and PRIOR PROCEEDINGS
 
 17
 United Fence alleges that from March 1985 through November 1989 it bid on 125 state contracts (some involving solely state-funded projects and some involving federally-assisted projects), and that subsequent to April 1, 1986 when the NYDOT implemented certain minority set-aside goals, it was awarded only two contracts. It maintains that a substantial portion of the contracts were awarded to a few select minority enterprises. On this basis, the district court found United Fence was deprived of the opportunity to compete for a percentage of work set aside by the NYDOT for minority firms. The trial court concluded, and we agree, that this represented a cognizable injury traceable to defendants' conduct, giving United Fence standing to challenge the programs at issue.
 
 
 18
 Harrison's complaint is directed at two particular contracts where it alleges that despite being the lowest bidder it was not awarded certain state contracts. The first contract involved Project D252729, a wholly state-funded project having a six percent minority and a two percent women-owned set-aside goal. Because the NYDOT rejected all bids on D252729, there is some question whether Harrison lost this contract as a result of the state's disadvantaged enterprises set-aside program. See Harrison & Burrowes, 743 F.Supp. at 987. In light of our holding, spelled out later, that damage actions against the named state officials would be barred because of their qualified immunity, we need not resolve this point.
 
 
 19
 The second contract involved Project D500812, a federally-assisted project on which NYDOT set a 12 percent minority goal and a two percent women-owned set-aside goal. Harrison secured less than two percent minority business participation by subcontractors on its proposed D500812 contract. The state awarded the project to the next lowest bidder since it determined that Harrison had not made a good faith effort to satisfy the state's minority set-aside goal. Harrison has standing to challenge the implementation of this program substantially for the reasons stated by the district court. See id. at 994-95.
 
 
 20
 On August 2, 1990 the district court granted Harrison's motion for a preliminary injunction restraining enforcement of New York's disadvantaged enterprises program, but denied the motion as to NYDOT's implementation of the similar federal program. See id. at 995-1005. It thereafter dismissed on the merits both appellants' challenges to the federal program as implemented by NYDOT. Based on the emergency regulations promulgated by the director of the state disadvantaged business development agency suspending enforcement of the disadvantaged enterprises program, the district court dismissed as moot the claims for injunctive and declaratory relief regarding the state program. The remaining claims for damages for state contracts--allegedly lost until the suspension of the set-aside program--were dismissed on the basis of the qualified immunity of the named state officials. Final judgments against United Fence and Harrison were entered on October 4 and 16, 1991 respectively. Because United Fence and Harrison now press identical arguments, we address their appeals together.
 
 DISCUSSION
 I Federal Program
 A. Standard of Review
 
 21
 United Fence and Harrison object to New York's implementation of the federal disadvantaged business set-aside program. They insist that when establishing set-asides above the congressionally-mandated minimum of ten percent, and when applying the set-asides to individual contracts, New York must justify them under the more stringent strict scrutiny standard of review required for wholly state-authorized programs. We disagree. This area of the law is governed by City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), where the Supreme Court invalidated, on equal protection grounds, a 30 percent minority business set-aside program established by the City of Richmond, Virginia. It found no compelling government interest had been shown to justify Richmond's race-based classification and that the program was not narrowly tailored to remedy past discrimination. The Court held the city had not demonstrated a sufficient constitutional justification for the plan primarily because nothing "provide[d] the city of Richmond with a strong basis in evidence for its conclusion that remedial action was necessary." Id. at 500, 109 S.Ct. at 724.
 
 
 22
 The critical distinction between Croson and the United Fence and Harrison complaints regarding the federal program is that Croson concerned a non-federal program. Croson distinguished the Court's prior decision in Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), which upheld the constitutionality of the federal set-aside program, on this ground. See Croson, 488 U.S. at 490-91, 109 S.Ct. at 719 (O'Connor, J., Rehnquist, C.J., and White, J.); id. at 522, 109 S.Ct. at 736 (Scalia, J., concurring in judgment) (concluding Fullilove did not control); cf. Drew S. Days, III, Fullilove, 96 Yale L.J. 453, 474 (1987) ("Fullilove clearly focused on the constitutionality of a congressionally mandated set-aside program.").
 
 
 23
 Fullilove had upheld the federal minority enterprises program--as noted, the program originated in § 103(f)(2) of the Public Works Employment Act of 1977, 42 U.S.C. § 6705(f)(2) (1988)--against an equal protection challenge. In a splintering of opinions reasoning that "Congress had abundant evidence from which it could conclude that minority businesses have been denied effective participation in public contracting opportunities," Fullilove, 448 U.S. at 477, 100 S.Ct. at 2774 (opinion of Burger, C.J.), stressing the special role of the Congress under § 5 of the Fourteenth Amendment, id. at 483-84, 100 S.Ct. at 2777, and emphasizing Congress' careful tailoring of a remedy, id. at 521, 100 S.Ct. at 2796 (Marshall, J., concurring in judgment), a majority of the Supreme Court upheld the constitutionality of the federal set-aside program.
 
 
 24
 After Fullilove it is now beyond doubt that the set-aside program for federally-funded projects was lawfully enacted. Whether the NYDOT implemented the authorized-by-Congress set-asides in such a way as to violate the equal protection clause depends on whether the NYDOT exceeded its federal grant of authority. Because the NYDOT program closely tracks the federal program, which United Fence and Harrison concede is constitutionally valid, its implementation of the federal disadvantaged businesses set-aside program is lawful.
 
 B. Substantive Challenges
 
 25
 Appellants contend that the New York program is constitutionally deficient because its 17 percent set-aside exceeds the Act's ten percent floor. They also object to the procedures through which NYDOT set annual and individual contract goals and weeded out "sham" disadvantaged enterprises. All of these arrows aimed at the New York program sail wide of the mark. None present an instance in which New York has exceeded its authority under the federal program.
 
 
 26
 As a preliminary matter, appellants cannot protest the federal program by claiming the state's implementation of it is unconstitutional. See Milwaukee County Pavers Ass'n v. Fiedler, 922 F.2d 419, 424 (7th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2261, 114 L.Ed.2d 714 (1991). Nor, in the absence of evidence tending to show that the NYDOT has deviated from the concededly valid federal regulations, may they attack the program "as applied" to them on the basis of the state regulations. See Ellis v. Skinner, 961 F.2d 912, 915-16 (10th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 374, 121 L.Ed.2d 286 (1992); see also Milwaukee County Pavers Ass'n v. Fiedler, 731 F.Supp. 1395, 1414 (W.D.Wis.1990) (finding constitutionality of implementation depends on relation to federal program), aff'd, 922 F.2d 419 (7th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2261, 114 L.Ed.2d 714 (1991); cf. Ecco III Enter., Inc. v. Metro-North Commuter R.R. Co., 170 A.D.2d 204, 565 N.Y.S.2d 103, 104 (1st Dept.) (holding state action invalid because federal approval requirements not followed), appeal denied, 78 N.Y.2d 863, 578 N.Y.S.2d 877, 586 N.E.2d 60 (1991). It is true, as appellants note, that Fullilove explicitly left open the question of the constitutionality of the 1977 Public Works Employment Act as applied in a particular case, see Fullilove, 448 U.S. at 486, 100 S.Ct. at 2778. But, they incorrectly assert that the instant case presents that left-open question.
 
 
 27
 It is their position that at least to the extent NYDOT has set goals beyond ten percent it may not rely on the federal authorization, but must make findings in line with Croson to support the additional set-aside. The language of the federal statutes--"not less than 10 per centum"--clearly contemplates minority set-asides above that figure, see Act § 106(c), 101 Stat. at 145, and USDOT implementing regulations explicitly allow states to set goals beyond ten percent. See 49 C.F.R. § 23.64(d). Further, although it was not Congress' plan by adding women-owned enterprises as presumptive disadvantaged enterprises in the Act to increase the minimum ten percent goal, see S.Rep. No. 4, supra, at 13, reprinted in 1987 U.S.C.C.A.N. at 78; H.R.Conf.Rep. No. 27, 100th Cong., 1st Sess. 148 (1987), reprinted in 1987 U.S.C.C.A.N. 121, 133, the legislature explicitly provided that "[s]ome states may wish to establish a [disadvantaged enterprise] goal which exceeds the minimum goal set by [the Act], and they are permitted to do so." H.R.Conf.Rep. No. 27, supra, at 148, reprinted in 1987 U.S.C.C.A.N. at 133 (emphasis added).
 
 
 28
 New York's choice of a 17 percent disadvantaged business set-aside therefore comports with the legislative purpose manifested in the Act. While it might make a difference in the conclusion we reach were the state to attempt to implement a setaside vastly greater than the ten percent minimum set by Congress, such an increase is not before us. The United Fence and Harrison challenges based on the 17 percent set-asides implemented by New York accordingly fail since the state department of transportation acted well within the bounds of the federal authority.
 
 
 29
 The other substantive issue raised is as to the procedures through which New York classified disadvantaged enterprises. Again, appellants' contention can hardly hold good since procedures the NYDOT established do not conflict with the federal regulations. Significantly, the program the state transportation department implements offers the same flexibility as do the federal requirements. The New York regulations do not order contractors to meet mandatory goals; instead they require only the same good-faith effort as that directed by the federal regulations. See N.Y.C.C.R.R. tit. 17, § 35.12(f), (h) (1992); 49 C.F.R. § 23.45(g)(2) (1991).
 
 
 30
 For example, a general contractor under the state's implementation need not offer a subcontract to a disadvantaged enterprise that submits an unreasonable bid. N.Y.C.C.R.R. tit. 17, § 35.12(f)(6) (1992). Further, disadvantaged business classification is adaptable under the New York program and ineligible enterprises may be excluded. In particular, the New York regulations permit enterprises not presumed to be disadvantaged to apply for classification as such, id. § 35.3(a)(3), and explicitly permit objections to the eligibility of an entity presumed to be a disadvantaged enterprise. Id. § 35.7. Nothing in the New York regulations pertaining to the classification of these enterprises conflicts with the federal program.
 
 
 31
 In addition, other federal courts facing similar questions following Croson have ruled that states need not make independent findings of discrimination when applying federal funds under either of the federal surface transportation statutes disadvantaged enterprise programs so long as the state regulations closely follow the federal requirements. See Ellis, 961 F.2d at 916; Tennessee Asphalt Co. v. Farris, 942 F.2d 969, 975 (6th Cir.1991); Milwaukee County, 922 F.2d at 423 ("If the state does exactly what the statute expects it to do, and the statute is conceded for purposes of the litigation to be constitutional, we do not see how the state can be thought to have violated the Constitution."). In such cases, the questioned state practice has been broadly mandated by Congress, which has specifically authorized the states to develop the details of implementation within the boundaries of its mandate. Thus, we reject appellants' challenge to New York State's implementation of Congress' minority enterprise program on the federally-funded highway construction projects at issue in this case.
 
 II State Program
 A. Mootness
 
 32
 It is conceded that New York's disadvantaged businesses program governing wholly state-funded construction projects must meet Croson 's requirements. Nor is there any serious question as to the district court's grant of a preliminary injunction against enforcement of the disadvantaged business program. The injunction issued on the ground that the program was suspect under Croson since it was not supported by findings of localized discrimination. See Harrison & Burrowes, 743 F.Supp. at 997-1002.
 
 
 33
 The central issue is whether the district court properly regarded the state agency's emergency regulation as mooting appellants' demand for declaratory and injunctive relief with respect to the state's minority businesses program. It must be remembered that the emergency regulation suspended enforcement of the program's goals until the state had an opportunity to develop a record demonstrating the requisite state interest supporting the proposed set-asides. We think the district court correctly regarded this part of the litigation as moot. Further, it continues to be moot because enforcement of the New York set-asides, particularly against these appellants, remains indefinite and uncertain.
 
 
 34
 The doctrine of mootness arises from the "case or controversy" requirement contained in Article III of the United States Constitution. The controversy between the parties must be a live one at all stages of federal court proceedings as a prerequisite to federal court jurisdiction. See Lewis v. Continental Bank Corp., 494 U.S. 472, 477, 110 S.Ct. 1249, 1253, 108 L.Ed.2d 400 (1990); 6A James W. Moore, Moore's Federal Practice p 57.13 (2d ed. 1992). While ordinarily the voluntary cessation of allegedly illegal conduct does not deprive a federal court of jurisdiction, such action does bear on whether the court should, in the exercise of its discretion, dismiss the case as moot. See City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982); United States v. W.T. Grant Co., 345 U.S. 629, 632-33, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). Although defendant bears a heavy burden when it seeks to have a case dismissed as moot, W.T. Grant, 345 U.S. at 633, 73 S.Ct. at 897, whether it should be dismissed or not lies within the sound discretion of the district court, and "a strong showing of abuse must be made to reverse it." Id. at 633, 73 S.Ct. at 898; accord Ahrens v. Bowen, 852 F.2d 49, 53 (2d Cir.1988). The district court did not abuse its discretion in dismissing appellants' complaints as moot because the emergency regulation suspends application of the minority enterprise goals on state-funded contracts.
 
 
 35
 We do not adopt appellants' characterization of the emergency regulation as a last-minute attempt to evade federal court jurisdiction. Some deference must be accorded to a state's representations that certain conduct has been discontinued. See DeFunis v. Odegaard, 416 U.S. 312, 317, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164 (1974) (per curiam). The conduct challenged here involves the state's implementation of a disadvantaged enterprises set-aside program. Insofar as appellants object to the enforcement of these goals without sufficient findings to justify that action, nothing on the record before us indicates that such enforcement will recur. Rather, New York appears to be on a course to develop those findings--previously lacking--to support its set-aside programs.
 
 
 36
 Nor are we faced with a "highly selective" discontinuance of enforcement, Soto-Lopez v. New York City Civil Serv. Comm'n, 840 F.2d 162, 168 (2d Cir.1988), or an "announced intention" to return to the conduct of the past, see Mesquite, 455 U.S. at 289 & n. 11, 102 S.Ct. at 1075 & n. 11, either of which would support the exercise of jurisdiction. The implementation of the set-aside program by New York State--absent specific findings of past discrimination--cannot be regarded as reasonably likely to be repeated. Appellants' petitions for declaratory and injunctive relief were therefore appropriately dismissed as moot by the district court. Cf. Maryland Highway Contractors Ass'n v. Maryland, 933 F.2d 1246, 1248-50 (4th Cir.) (claims for declaratory and injunctive relief regarding state minority program dismissed as moot where legislature repealed statute and enacted new statute in attempt to comply with Croson ), cert. denied, --- U.S. ----, 112 S.Ct. 373, 116 L.Ed.2d 325 (1991).
 
 B. Appellants' Contentions Against Mootness
 
 37
 Harrison and United Fence nonetheless advance several reasons why their case cannot be moot. They begin by positing that article 15-A does not give the state agency authority to promulgate implementing regulations that exclude any of the statute's listed preference groups, and that it can only be enforced as enacted. Moreover, they continue, on its face 15-A mandates racial and gender preferences that the state disadvantaged business development agency is powerless to change. Appellants say the state cannot rely on post hoc justifications to rehabilitate the statute; once the minority enterprises set-asides are "reimplemented," the constitutionality of the plan will remain unaffected by findings made subsequent to its adoption. Hence, appellants conclude, since any implementing regulations will not impact on the set-aside program originally created under 15-A, their challenge to that statute as facially violating Croson is not moot.
 
 
 38
 These points have a seeming plausibility, wanting only statutory support to be completely convincing. That support, of course, is lacking as an examination of the provisions of article 15-A reveals. The statute empowers the agency director to promulgate regulations "to encourage and assist" minority businesses in receiving a "fair share" of and "meaningful participation" in work on state contracts. See Art. 15-A, §§ 311(3)(a), 313(1). This language is properly construed as merely authorizing good faith efforts to solicit minority participation in state contracts, but not mandating such efforts under all circumstances. The statute in that way grants the state's disadvantaged business development agency sufficient flexibility to promulgate regulations rendering 15-A constitutional.
 
 
 39
 In addition, statutes must be construed so as to avoid constitutional difficulties whenever possible, see, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988), and we think this an appropriate and reasonable construction of article 15-A. Appellants' reading of the state statute as requiring particular set-asides cannot be reconciled with its permissive language, for instance, in phrases like "encourage," "assist," "fair share," and "meaningful participation." None of these terms may be applied in the ethereal abstract, but obviously need implementing regulations to give them the flesh and bone of substance and meaning. Because article 15-A does not mandate minority participation goals, the agency is free to promulgate those regulations that will implement the statute in accordance with Croson. See Cone Corp. v. Florida Dep't of Transp., 921 F.2d 1190, 1207-08 (11th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2238, 114 L.Ed.2d 479 (1991).
 
 
 40
 Similarly unavailing is Harrison's insistence that the constitutionality of 15-A be assessed on the record of discrimination, if any, that existed in New York's construction industry at the time of its enactment. The law is plain that the constitutional sufficiency of a state's proffered reasons necessitating an affirmative action plan should be assessed on whatever evidence is presented, whether prior to or subsequent to the program's enactment. See Coral Constr. Co. v. King County, 941 F.2d 910, 920 (9th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 875, 116 L.Ed.2d 780 (1992); see also Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia, 945 F.2d 1260, 1267 (3d Cir.1991); Cone Corp. v. Hillsborough County, 908 F.2d 908, 915 (11th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990). Moreover, when reviewing a statute's constitutionality, courts routinely consider any interpretive limitations placed on it by implementing regulations, which obviously must follow the statute's enactment. See Ward v. Rock Against Racism, 491 U.S. 781, 795, 109 S.Ct. 2746, 2756, 105 L.Ed.2d 661 (1989); Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 504, 102 S.Ct. 1186, 1196, 71 L.Ed.2d 362 (1982). Thus, later obtained evidence relied on by the state agency may certainly be considered when adjudging the constitutionality of New York State's minority program.
 
 
 41
 Of course, whether that program, however it may in the future be enforced, will survive scrutiny under Croson cannot be decided until the bases for adopting particular set-asides are known and the state proceeds to enforce them. In that connection, we take note that following oral argument and briefing, in August 1992 the agency, now renamed the Division of Minority and Women's Business Development, announced it had determined that a factual basis demonstrated a compelling state interest supports requiring good faith efforts by contractors to meet minority enterprise goals and that a constitutionally-sufficient state interest exists to support requiring those efforts as to women-owned enterprises. We are informed that the agency's findings shall soon be published in the state register. Nonetheless, these developments have not rendered the instant case justiciable. No goals by New York agencies of which we are aware have yet been submitted and approved by the agency's director and good faith requirements continue to go unenforced. Thus, while New York has apparently announced an intention to enforce the set-asides based on findings it now claims to have made, the extent and timing of enforcement have not yet been established.
 
 
 42
 Constitutional challenges to statutes are routinely found moot when a statute is amended, see Massachusetts v. Oakes, 491 U.S. 576, 582, 109 S.Ct. 2633, 2638, 105 L.Ed.2d 493 (1989), or unripe when proposed regulatory amendments are pending. See Shoemaker v. Handel, 795 F.2d 1136, 1144 (3d Cir.), cert. denied, 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986). Although the district court thought it reasonably likely New York would in the future implement minority set-asides, no ripe challenge on this issue has developed. Cf. Cone Corp. v. Florida, 921 F.2d at 1208-09 (noting that plaintiffs lacked standing since no injury was likely given agency discretion in implementing minority program). The program has not been enforced against appellants or other businesses. At present, therefore, we find no live controversy regarding New York's set-aside program. The district court acted well within its discretion in dismissing plaintiffs' claims for declaratory and injunctive relief as moot. As the case originally brought by appellants is moot and any future controversy regarding the reimplemented statute is unripe for adjudication, the district court's order should be affirmed.
 
 III Qualified Immunity
 
 43
 Although appellants' claims for declaratory and injunctive relief are moot, their claims for damages under 42 U.S.C. § 1983 as a result of the minority program's past operation remain viable. See Croson, 488 U.S. at 478 n. 1, 109 S.Ct. at 713 n. 1; Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 154 n. 3, 98 S.Ct. 1729, 1732 n. 3, 56 L.Ed.2d 185 (1978). The trial court ruled defendants were shielded from suit under the doctrine of qualified immunity. Qualified immunity protects government officials performing discretionary functions from suit and liability for damages for actions taken in their official capacity, unless their conduct violated clearly established rights. See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The availability of the defense turns on the reasonableness of the officials' conduct in reference to clearly established law. Id. The right allegedly violated must be regarded as "sufficiently particularized" so that a reasonable official would understand it was being violated. See Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).
 
 
 44
 The question on which this defense hinges is whether it was clear even before Croson that state affirmative action set-aside plans had to be narrowly tailored to a compelling government interest and that a record of prior discrimination within a locality was an absolute necessity before minority preferences could be implemented. Until Croson, it was far from clear that a state could not implement an affirmative action plan in reliance upon Congress' findings of societal discrimination in an industry. See Days, supra, 96 Yale L.J. at 454 ("[A]lthough the outcome in Fullilove turned upon the fact that the Court was reviewing an Act of Congress, the case has been viewed as authorization for the creation of non-federal minority set-asides."). Numerous states had in fact implemented plans much like the New York program. Id. at 454 n. 10. Appellants' rights were not "clearly" violated by New York's set-aside of about 12 percent given that the "at least" ten percent set-aside in the Public Works Employment Act was upheld in Fullilove. Because it was not objectively unreasonable for defendants to believe their actions in enforcing New York's disadvantaged enterprises program were consistent with the mandates of equal protection, they are protected by qualified immunity. See Robison v. Via, 821 F.2d 913, 921 (2d Cir.1987).
 
 
 45
 United Fence and Harrison fare no better respecting defendants' post-Croson conduct. Croson made only broad pronouncements concerning the findings necessary to support a state's affirmative action plan and generally provided that the plan had to be narrowly tailored, but left the validity of particular plans to be assessed on a case-by-case basis. See Cone Corp. v. Hillsborough County, 908 F.2d at 913. Again, Croson may not apply to women-owned business enterprise programs, see Milwaukee County Pavers, 922 F.2d at 422, and the appropriate standard of review concerning gender-based set-asides remains unclear. Compare Associated Gen. Contractors v. San Francisco, 813 F.2d 922, 941 (9th Cir.1987) (applying substantially related to important government interests standard to women-owned business preferences), mandamus dismissed, 493 U.S. 928, 110 S.Ct. 296, 107 L.Ed.2d 276 (1989) with Conlin v. Blanchard, 890 F.2d 811, 816 (6th Cir.1989) (requiring gender-based affirmative action to be narrowly tailored to remedy prior discrimination by government entity involved).
 
 
 46
 Consequently, while Croson may have made plain--at least with respect to New York's minority set-aside program--that strict scrutiny applied to such programs and the state had to make its own findings of prior discrimination within the state in order to establish such a set-aside program, it cannot be said that New York's program, even post-Croson, would have been regarded by a reasonable public official as clearly unconstitutional. In other words, it cannot be said that "the boundaries of the supposed 'right' [were] sufficiently definite" so that the unlawfulness of the defendants' conduct was evident. Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir.1988). Accordingly, Harrison and United Fences' damage claims against the named state officials are barred by qualified immunity.
 
 CONCLUSION
 
 47
 For the reasons above stated, the judgments of the district court are accordingly affirmed.
 
 
 
 *
 Honorable William C. Conner, Senior Judge, United States District Court for the Southern District of New York, sitting by designation