438 F.3d 195
 JANA-ROCK CONSTRUCTION, INC. and Rocco Luiere, Jr., Plaintiffs-Appellants,
v.
NEW YORK STATE DEPARTMENT OF ECONOMIC DEVELOPMENT, Division of Minority & Women's Business Development, and Jorge I. Vidro, as Director of the Division of Minority & Women's Business Development, Defendants-Appellees.
 Docket No. 04-6328.
 United States Court of Appeals, Second Circuit.
 Argued: October 20, 2005.
 Decided: February 21, 2006.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Vic J. Kopnitsky, Jr., Menter, Rudin & Trivelpiece, P.C., Syracuse, NY, for Plaintiffs-Appellants.
 Michelle Aronowitz, Deputy Solicitor General (Eliot Spitzer, Attorney General for the State of New York, Caitlin J. Halligan, Solicitor General, Robert H. Easton, Deputy Solicitor General, and Benjamin N. Gutman and Ann P. Zybert, Assistant Solicitors General, of counsel), New York NY, for Defendants-Appellees.
 Before: OAKES, JACOBS, and SACK, Circuit Judges.
 SACK, Circuit Judge.
 
 
 1
 Rocco Luiere, Jr., "the son of a Spanish mother whose parents were born in Spain," owns seventy-five percent of the shares in Jana-Rock Construction, Inc. See Compl. ¶¶ 3, 4. Luiere and Jana-Rock bring a challenge under the Equal Protection Clause of the Fourteenth Amendment to New York Executive Law Article 15-A, New York's "affirmative action" statute for minority-owned businesses, because the law does not include in its definition of "Hispanic" people of Spanish or Portuguese descent unless they also come from Latin America. The plaintiffs allege that by distinguishing among different subclasses of Hispanics, Article 15-A contains an explicit classification on the basis of national origin that should be subjected to strict scrutiny, and that under strict scrutiny New York's definition of "Hispanic" would fail. Applying rational basis review rather than strict scrutiny, the district court (Neal P. McCurn, Judge) entered judgment in favor of the defendants and dismissed the complaint.
 
 
 2
 When a plaintiff challenges "racial classifications, imposed by whatever federal, state, or local governmental actor, [the classifications] must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." Adarand Contructors, Inc. v. Peña, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).[1] "[T]he purpose of strict scrutiny is to `smoke out' illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool." City of Richmond v. J.A. Croson Co., 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (plurality opinion).
 
 
 3
 But once the government has shown that its decision to resort to explicit racial classifications survives strict scrutiny by being narrowly tailored to achieve a compelling interest, its program is no longer presumptively suspect. We do not think that it is appropriate automatically to apply strict scrutiny a second time in determining whether an otherwise valid affirmative action program is underinclusive for having excluded a particular plaintiff. In order to trigger strict scrutiny, such a plaintiff — like other plaintiffs with equal-protection claims — must demonstrate that his or her exclusion was motivated by a discriminatory purpose. Because the plaintiffs do not otherwise challenge the constitutional propriety of New York's race-based affirmative action program, and because Luiere and Jana-Rock cannot show that New York adopted its chosen definition of "Hispanic" for a discriminatory purpose or that its definition lacks a rational basis, we agree with the district court's judgment for the defendants and affirm.
 
 BACKGROUND
 
 4
 The United States Department of Transportation (USDOT) and New York State each has its own affirmative action program for minority-owned businesses. The federal and state programs have different definitions of the term "Hispanic." USDOT's program has been in effect since the Surface Transportation Assistance Act of 1982, Pub.L. No. 97-424, 86 Stat.2097 (1983). Congress has re-authorized the set-aside program several times under several different names. See Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo (Harrison & Burrowes II), 981 F.2d 50, 53-54 (2d Cir.1992) (recounting legislative history through 1992); W. States Paving Co. v. Wash. State Dep't of Trans., 407 F.3d 983, 988 (9th Cir.2005) (recounting legislative history through 2004), petition for cert. filed, 74 U.S.L.W. 3308 (Nov. 7, 2005) (No. 05-591). It was most recently re-authorized by the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Pub.L. No. 109-59, 119 Stat. 1144 (2005).
 
 
 5
 The USDOT program incorporates by reference the Small Business Act's definition of disadvantaged business enterprise (DBE), which creates a presumption of DBE status for "Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities." 15 U.S.C. § 637(d)(3)(C). The USDOT has implemented regulations which, inter alia, define the term "Hispanic Americans" as "persons of Mexican, Puerto Rican, Cuban, Dominican, Central or South American, or other Spanish or Portuguese culture or origin, regardless of race." 49 C.F.R. § 26.5.
 
 
 6
 The USDOT's decision to include "other Spanish or Portuguese culture or origin" in the definition of "Hispanic" represents a careful policy choice. Initially, DOT had excluded persons of Spanish or Portuguese descent from the definition. The Department later revised its definition to include persons of Spanish or Portuguese origin, however, after receiving comments and a petition for rulemaking from the Hispanic American Contractors Association of McLean, Virginia. See Request for Comment on Petition to Amend 49 C.F.R. Part 23, 46 Fed.Reg. 969 (Jan. 5, 1981) (requesting comments in response to the petition); Definition of "Hispanic" in Department of Transportation Minority Business Enterprise Regulation, 46 Fed.Reg. 60458 (Dec. 10, 1981) (issuing a final rule amending the definition of "Hispanic").
 
 
 7
 After the Supreme Court's 1995 decision in Adarand Constructors, which held that federal affirmative action programs must satisfy strict scrutiny, the DOT revisited the issue. The department ultimately concluded: "We recognize that the inclusion of persons of European Spanish and Portuguese origin is controversial, but, absent legislative direction to the contrary, we believe it is necessary to leave the definition unchanged." Participation by Disadvantaged Business Enterprise in Department of Transportation Programs, 62 Fed. Reg. 29548, 29550 (May 30, 1997).
 
 
 8
 Although the DBE set-aside program is federal, "[t]he states become involved because[, inter alia, state] recipients of federal funds . . . must comply with USDOT regulations concerning minority business participation." Harrison & Burrowes II, 981 F.2d at 54. "[A] state recipient must establish annual overall minority enterprise participation goals on projects receiving federal funds and must ensure that at least ten percent of monies expended on federally-assisted projects go to such enterprises, absent a waiver from the Secretary of Transportation." Id. (citations omitted). The New York State Department of Transportation (N.Y.DOT) is responsible for ensuring compliance with the federal program and certifying minority-owned businesses for this purpose. See N.Y. High. Law § 85; N.Y. Transp. Law § 428(1); N.Y. Comp.Codes R. & Regs. tit. 17, pt. 35.
 
 
 9
 In 1987, Jana-Rock sought DBE certification from NYDOT by submitting an application to New York State's "Minority and Women-Owned Business Enterprise Certification Program." In an undated letter, the NYDOT responded, informing Jana-Rock that it had been certified as "a Minority Owned Business." The current director of New York State's Division of Minority and Women's Business Development, Jorge Vidró, has submitted an affidavit stating, upon information and belief, that although the 1987 certification was silent on the matter, it was intended to be effective exclusively for the federal set-aside programs. See Affidavit of Jorge Vidró (dated Aug. 11, 2004) (Vidró Aff.), ¶¶ 7, 8, 15.
 
 
 10
 New York State also has a separate minority-owned business program of its own. It was originally created by Executive Order in 1983 and was later enacted by the state legislature as a state statute that became effective in 1988. N.Y. Exec. L., art. 15-A. The state program, under Article 15-A, includes in its definition of minorities "Hispanic persons of Mexican, Puerto Rican, Dominican, Cuban, Central or South American of either Indian or Hispanic origin, regardless of race." N.Y. Exec. L. § 310(8)(b).[2] Unlike the federal USDOT definition, it does not include all persons from, or descendants of persons from, Spain or Portugal.
 
 
 11
 On May 11, 1989, some two years after Jana-Rock had received its undated NYDOT certification, Luiere received a letter from the New York Governor's State Office of Minority and Women's Business Development (OMWBD) stating that Jana-Rock had been certified as a state "Minority Business or Women's Enterprise." This certification was apparently based on Luiere's application to the NYDOT to become a DBE for purposes of the federal program. But while Luiere qualified as a Hispanic for purposes of the federal program, his business did not qualify as a minority business enterprise (MBE) under the state definition of Hispanic. According to Vidró's affidavit, this error resulted from Article 15-A's transfer of responsibility for certifying state MBEs from the NYDOT to the newly created state OMWBD. In that connection, NYDOT was responsible for forwarding to the OMWBD a list of all of the businesses that qualified for certification under the state program. Vidró's affidavit stated that, to the best of his knowledge, NYDOT erroneously included Jana-Rock on that list. Vidró Aff. ¶ 15.
 
 
 12
 NYDOT repeatedly re-certified Jana-Rock for federal DBE status from 1989 through 2003. Although Luiere understandably thought that these re-certifications as a federal DBE also constituted re-certifications as a state MBE, according to Vidró, "there is no concurrent certification between the State and Federal program nor is there reciprocity of certification." Id. Luiere nonetheless did receive a letter in 1997 confirming Jana-Rock's continued certification as a state MBE from the Division of Minority and Women's Business Development (DMWBD) of the New York State Department of Economic Development, the successor of the OMWBD.[3]
 
 
 13
 On September 12, 2001, the DMWBD requested that Luiere reapply for certification as a state MBE. Luiere submitted a new application on October 11, 2001. He did not hear from the DMWBD again until January 6, 2003, when the division informed him that it intended to revoke Jana-Rock's certification as a state MBE because he had not provided documentation of his status as an "Hispanic person[] of Mexican Puerto Rican, Dominican, Cuban, Central or South American of either Indian or Hispanic origin." Ex. D to Vidró Aff. Luiere replied by letter on January 24, 2003, stating that "I am a Hispanic from Spain." Ex. E to Vidró Aff. The DMWBD formally revoked Jana-Rock's MBE status on February 10, 2003. On March 6, 2003, Luiere requested an evidentiary hearing.
 
 
 14
 On April 5, 2004, after the hearing was concluded, a state administrative law judge (ALJ) recommended that Jana-Rock's state certification be renewed and that the director of the DMWBD waive the State's definition of Hispanic in light of the fact that Jana-Rock held certification in the federal DBE program. On April 28, 2004, Vidró reversed the ALJ's decision. In an affidavit, Vidró explained:
 
 
 15
 My April 28 determination found the ALJ: 1. misapplied the waiver provision of Executive Law § 313(3); 2. erroneously gave weight to petitioner's irrelevant argument that there were no changes in petitioner's circumstances; and 3. created Constitutional problems by expanding the definition of the minority group at issue beyond the definition specifically designed, as required by the United States Supreme Court, to remedy past proven discrimination.
 
 
 16
 Vidró Aff. ¶ 24 (citations omitted). On June 2, 2004, Jana-Rock filed an action in New York State Supreme Court seeking to annul the revocation decision. See Matter of Jana-Rock Constr. Inc. v. N.Y. State Dep't of Econ. Dev., Index No. 3267-04 (Sup.Ct. Albany County). By Order dated March 31, 2005, the court transferred the case to the Appellate Division, Third Department, where it is now pending.
 
 
 17
 Meanwhile, on June 3, 2004, Luiere and Jana-Rock brought suit in the United States District Court for the Northern District of New York against the DMWBD and Vidró, in his official capacity, seeking a determination that the State's definition of "Hispanic" violates the Equal Protection Clause of the Fourteenth Amendment, both on its face and as applied to them, and seeking a permanent injunction barring state agencies from denying them the benefits of Article 15-A. The complaint also seeks a temporary injunction, temporary restraining order, and attorney's fees pursuant to 42 U.S.C. § 1988.
 
 
 18
 After denying the application for a temporary restraining order, the court scheduled a preliminary injunction hearing to be consolidated with a trial on the merits. The parties did not proffer any witnesses and relied exclusively on their submitted documentary evidence. After hearing oral argument and considering the parties' proposed findings of fact and conclusions of law, the district court issued a Memorandum and Order dated October 28, 2004, ruling that Luiere and Jana-Rock were not entitled to the relief they sought and entering judgment for the defendants pursuant to Federal Rules of Civil Procedure 52(a) and 58.
 
 DISCUSSION
 I. Standard of Review
 
 19
 We review the district court's factual findings to determine whether they are clearly erroneous. White v. White Rose Food, 237 F.3d 174, 178 (2d Cir.2001). We review the district court's conclusions of law de novo. D.M. Rothman & Co., Inc. v. Korea Commercial Bank of N.Y., 411 F.3d 90, 96 (2d Cir.2005).
 
 II. Constitutional Standing
 
 20
 The district court found that Luiere and Jana-Rock had standing to bring their equal protection challenge before it. In order to establish standing in federal court under Article III of the Constitution, a plaintiff must demonstrate: (1) an "injury in fact," (2) a "causal connection between the injury and the conduct complained of," and (3) a "substantial likelihood that the requested relief will remedy the alleged injury in fact." McConnell v. FEC, 540 U.S. 93, 225, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (internal quotation marks and citations omitted). When a plaintiff challenges a race-based[4] affirmative action program, the injury in fact "is the inability to compete on an equal footing in the bidding process, not the loss of a contract." N.E. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993).
 
 
 21
 The plaintiffs have alleged an injury in fact under this standard. They assert that the state has used an invidious classification based on race and nationality to prevent them from competing on equal footing with other Hispanics. The remaining requirements for standing are satisfied because this alleged injury is traceable to, and would be redressed by, an injunction ordering that Luiere be treated the same as are non-Spanish Hispanics. Cf. Clinton v. City of New York, 524 U.S. 417, 433 n. 22, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) ("Having found that both the New York and Snake River appellees are actually injured, traceability and redressability are easily satisfied — each injury is traceable to the President's cancellation of § 4722(c) or § 968, and would be redressed by a declaratory judgment that the cancellations are invalid.").
 
 
 22
 III. The Legal Standard for Plaintiffs' Equal Protection Claim
 
 
 23
 Generally, for an equal protection claim to trigger strict scrutiny, the plaintiff must allege that a government actor intentionally discriminated against him or her on the basis of race or national origin. See Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir.1999). Such intentional discrimination can be proven in several ways.
 
 
 24
 "[A] law which is facially neutral violates equal protection if it is applied in a discriminatory fashion." Id. (citing Yick Wo v. Hopkins, 118 U.S. 356, 373-74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)). Government action also violates principles of equal protection "if it was motivated by discriminatory animus and its application results in a discriminatory effect." Id. "When there is a proof that a discriminatory purpose has been a motivating factor in the decision . . . judicial deference is no longer justified." Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265-66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (footnote omitted). Plaintiffs challenging such facially neutral laws on equal protection grounds bear the burden of making out a "prima facie case of discriminatory purpose." Davis, 426 U.S. at 241, 96 S.Ct. 2040.
 
 
 25
 When the government expressly classifies persons on the basis of race or national origin, however, its action is "`immediately suspect.'" Johnson v. California, 543 U.S. 499, 125 S.Ct. 1141, 1148, 160 L.Ed.2d 949 (2005) (quoting Shaw v. Reno, 509 U.S. 630, 642, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993)). A plaintiff in such a lawsuit need not make an extrinsic showing of discriminatory animus or a discriminatory effect to trigger strict scrutiny. "No inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute." Shaw, 509 U.S. at 642, 113 S.Ct. 2816. The burden of proof shifts, strict scrutiny applies, and "[u]nder strict scrutiny, the government [defending the constitutionality of the law] has the burden of proving that racial classifications `are narrowly tailored measures that further compelling governmental interests.'" Johnson, 125 S.Ct. at 1146 (quoting Adarand, 515 U.S. at 227, 115 S.Ct. 2097). As noted above, the Supreme Court has explained that we "`apply strict scrutiny to all racial classifications to "smoke out" illegitimate uses of race by assuring that government is pursuing a goal important enough to warrant use of a highly suspect tool.'" Id. (quoting Croson, 488 U.S. at 493, 109 S.Ct. 706 (plurality opinion)) (emphasis in Johnson; alteration incorporated).
 
 
 26
 Since Croson, it has been firmly established that state affirmative action programs that employ explicit racial classifications are subject to strict scrutiny. The plaintiffs concede that Article 15-A is justified by a compelling state interest in remedying past discrimination and that it is generally narrowly tailored to achieve that end. They argue, however, that New York's definition of Hispanic is fatally underinclusive for not including persons of Spanish descent.
 
 
 27
 In evaluating the plaintiffs' challenge, we must initially determine whether New York's decision not to include persons of Spanish ancestry in Article 15-A is automatically subject to strict scrutiny, or whether the plaintiffs must show that the exclusion was motivated by a discriminatory purpose in order to trigger heightened review.
 
 
 28
 
 A. Is Underinclusiveness Automatically Subject to Strict Scrutiny?
 
 
 
 29
 We can identify two distinct ways of construing the plaintiffs' argument that their exclusion from New York's affirmative action program should be subject to strict scrutiny. Under one view of their argument, strict scrutiny should be used to evaluate whether the Article 15-A program as a whole is underinclusive. The argument is that in making a racial classification to remedy discrimination against certain ethnic groups and nationalities (here, Hispanics from Latin America), New York must also justify its decision not to remedy discrimination against other groups as well (here, persons of Spanish descent).
 
 
 30
 Under a second view of the plaintiffs' argument, the program as a whole is valid, but strict scrutiny should be used to evaluate whether Article 15-A's particular definition of "Hispanic" is underinclusive. The argument is that in making a racial classification to remedy discrimination against Hispanics, New York must justify its selection of one definition of that term over another.
 
 
 31
 Under either view, we think that the plaintiffs' argument for applying strict scrutiny fails.
 
 
 32
 1. Applying Strict Scrutiny to Underinclusive Programs. To survive strict scrutiny, a race-based affirmative action program must be a "`narrowly tailored measure[] that further[s] compelling governmental interests.'" Johnson, 125 S.Ct. at 1146 (quoting Adarand, 515 U.S. at 227, 115 S.Ct. 2097). In determining whether a program is narrowly tailored, we have considered: "(1) the necessity for relief and the efficacy of alternative remedies, (2) the flexibility and duration of the relief, (3) the relationship of the numerical goals of the relief to the relevant labor market (or to its analog in a case involving something other than employment discrimination), and (4) the impact of the relief on the rights of third parties." United States v. Sec'y of HUD, 239 F.3d 211, 219 (2d Cir.2001) (citing United States v. Paradise, 480 U.S. 149, 171, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987)), cert. denied sub nom. City of Yonkers v. United States, 534 U.S. 1054, 122 S.Ct. 643, 151 L.Ed.2d 562 (2002).
 
 
 33
 The plaintiffs concede that Article 15-A is narrowly tailored in all these respects. In resolving plaintiffs' allegations that the program is fatally underinclusive for not including persons of Spanish descent, we must determine whether underinclusiveness should be analyzed as part of the narrow-tailoring inquiry (where the government still bears the burden of persuasion), or instead as a challenge to a presumptively valid program that is narrowly tailored in all other respects (where that burden would be borne by the plaintiff).
 
 
 34
 We conclude that the narrow-tailoring requirement allows New York to identify which groups it is prepared to prove are in need of affirmative action without demonstrating conclusively that no other groups merit consideration for the program. "In adopting an affirmative action plan [a state] may rationally limit its application to those minority groups in the local work force that are most in need of remedial efforts." Peightal v. Metro. Dade County (Peightal I), 940 F.2d 1394, 1409 (11th Cir.1991) (Brown, J., concurring). And we think that in doing so the state need not bear the burden of persuasion to justify its decision not to extend affirmative action to other groups.[5]
 
 
 35
 The narrow-tailoring requirement "ensures that the means chosen `fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." Croson, 488 U.S. at 493, 109 S.Ct. 706 (plurality opinion). The plaintiffs, in effect, are asking us to declare that the fit in Article 15-A is too tight — that equal protection requires it to be expanded to include other racial and ethnic groups that may have been discriminated against. Such a requirement would have no limit. In this case, for example, we can see no particular reason why New York's decision to exclude persons of Spanish extraction from its affirmative action program should be scrutinized more closely than its decision not to include any other racial group or nationality — Italians, Chinese or Irish. If it instituted any affirmative action program for some groups with a history of discrimination, the state would be required to prove a negative — to show that no other group had also been discriminated against. We doubt that the Supreme Court had such court-ordered expansions of affirmative action programs in mind when it decided Croson and Adarand.[6]
 
 
 36
 Evaluating underinclusiveness as a prong of strict scrutiny would be incompatible with the Supreme Court's requirement that affirmative action programs be no broader than demonstrably necessary. In Croson, the Court struck down Richmond, Virginia's affirmative action program in part because of its "gross overinclusiveness." Croson, 488 U.S. at 506, 109 S.Ct. 706 (plurality opinion). In the course of doing so, it criticized the city's inclusion of "Spanish-speaking, Oriental, Indian, Eskimo, and Aleut persons" in the program because Richmond had failed to provide any evidence of past discrimination against these groups in Richmond's construction industry — a showing that the Court stated would be necessary to demonstrate that the city had a compelling governmental interest in providing race—or national-origin-based affirmative action for such persons. The Croson plurality declared that "[t]he random inclusion of racial groups that, as a practical matter, may never have suffered from discrimination in the construction industry in Richmond suggests that perhaps the city's purpose was not in fact to remedy past discrimination." Id. In addition to casting doubt on the government's motives, the Court indicated that such overinclusiveness was incompatible with strict scrutiny's "narrowly tailoring" requirement: "If a 30% set-aside was `narrowly tailored' to compensate black contractors for past discrimination, one may legitimately ask why they are forced to share this `remedial relief' with an Aleut citizen who moves to Richmond tomorrow?" Id.
 
 
 37
 Under the plurality's reasoning in Croson, the more racial and ethnic groups that a state includes in its affirmative action program, the more vulnerable that program becomes to constitutional attack under applicable strict-scrutiny standards. Thus, at least four of our sister circuits have employed Croson's analysis of overinclusiveness to strike down state and local affirmative action programs that included more racial and ethnic groups than necessary. See Builders Ass'n of Greater Chi. v. County of Cook, 256 F.3d 642, 647 (7th Cir.2001); Associated Gen. Contractors of Ohio, Inc. v. Drabik, 214 F.3d 730, 737 (6th Cir.2000), cert. denied, 531 U.S. 1148, 121 S.Ct. 1089, 148 L.Ed.2d 963 (2001); Monterey Mech. Co. v. Wilson, 125 F.3d 702, 714 (9th Cir.1997), reh'g en banc denied, 138 F.3d 1270 (9th Cir.1998); O'Donnell Constr. Co. v. District of Columbia, 963 F.2d 420, 427 (D.C.Cir.1992).
 
 
 38
 In Builders Association of Greater Chicago, the Seventh Circuit declared that Cook County's affirmative action program was unconstitutionally overinclusive because it included persons of Spanish descent within its definition of "Hispanic" for purposes of the county's affirmative action program. The court reasoned that "[t]he concern with racial discrimination does not extend to Spanish or Portuguese people, or the concern with ethnic discrimination to persons of Spanish or Portuguese ancestry born in the United States." Builders Ass'n, 256 F.3d at 647. "[E]ven as to those born abroad, there is nothing to differentiate immigrants from Spain or Portugal from immigrants from Italy, Greece, or other southern European countries so far as a history of discrimination in the United States is concerned." Id. In short, the court declared, "common sense (not contradicted by any evidence) instructs" that persons of Spanish and Portuguese descent "have never been subject to significant discrimination by Cook County." Id.; see also Drabik, 214 F.3d at 737 ("By lumping together the groups of Blacks, Native Americans, Hispanics, and Orientals (and leaving unclear the exact extent of the last two designations) the MBEA may well provide preference where there has been no discrimination . . . .").
 
 
 39
 We express no view of our own as to the merits of the Seventh Circuit's position or as to whether New York could choose to broaden its definition of "Hispanic" to include persons of Spanish or Portuguese descent without rendering it unconstitutionally overinclusive. Different courts evaluating different affirmative action plans in different circumstances may well come to different conclusions even if they apply (as of course they should) similar principles. Cf. Peightal v. Metro. Dade County (Peightal II), 26 F.3d 1545, 1559-60 (11th Cir.1994) (upholding Metro Dade's inclusion of Spanish descendants within its definition of Hispanic because "[t]he investigatory procedures utilized by the affirmative action office operated as a check to the self-identification procedure and also operated to narrow the definition of the protected group to those with strong visible indications of cultural and linguistic identification with the group, thus ensuring that non-minorities would not erroneously receive race-conscious relief").
 
 
 40
 But whether or not, in light of Croson, it would be constitutionally permissible for New York State to include persons of Spanish descent in Article 15-A, there can be no question that New York risks having its MBE program struck down if it expands it further than necessary to remedy past discrimination in New York. Indeed, a federal court preliminarily enjoined New York from implementing Article 15-A until the state could provide a "`strong basis in evidence for its conclusion that race-conscious remedial action was necessary.'" Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo (Harrison & Burrowes I), 743 F.Supp. 977, 1001 (N.D.N.Y.1990) (quoting Croson, 488 U.S. at 500, 109 S.Ct. 706). In order to save the statute, the state promulgated emergency regulations suspending its MBE program until the state could compile evidence to show "that a factual basis demonstrated a compelling state interest." See Harrison & Burrowes II, 981 F.2d at 60 (affirming dismissal of case as moot in light of Article 15-A's suspension). In July 1992, the DMWBD issued a formal report, "Opportunity Denied!" compiling evidence of past race-discrimination in New York. On the basis of that report, the state re-issued regulations, ended the suspension, and enforced Article 15-A again. See N.Y. Comp.Codes R. & Regs. tit.9, §§ 540-544 (1992) (current version at N.Y. Comp.Codes R. & Regs. tit.5, § 140-144); see also John J. Sullivan, Note, The Constitutionality of New York State's Affirmative Action Law, 21 Fordham Urb. L.J. 1107, 1127-42 (1994).
 
 
 41
 The plaintiffs point out that the USDOT has long included persons of Spanish descent within its definition of Hispanics. Thus, in their view, there would be no danger to New York State if it were to do the same. But Congress and federal agencies have more leeway to make broader classifications — even after Adarand extended strict scrutiny to federal affirmative action programs — because the federal government must set policy on a national level. "Whereas municipalities must necessarily identify discrimination in the immediate locality to justify a race-based program, we do not think that Congress needs to have had evidence before it of discrimination in all fifty states . . . ." Rothe Dev. Corp. v. U.S. Dep't of Def., 262 F.3d 1306, 1329 (Fed.Cir.2001); accord W. States Paving, 407 F.3d at 992; Sherbrooke Turf, Inc. v. Minn. Dep't of Transp., 345 F.3d 964, 970 (8th Cir.2003), cert. denied, 541 U.S. 1041, 124 S.Ct. 2158, 158 L.Ed.2d 729 (2004); Adarand Constructors, Inc. v. Slater, 228 F.3d 1147, 1175-76 (10th Cir.2000), cert. granted in part, 532 U.S. 967, 121 S.Ct. 1598, 149 L.Ed.2d 464, and cert. dismissed as improvidently granted, 534 U.S. 103, 122 S.Ct. 511, 151 L.Ed.2d 489 (2001) (per curiam). Croson itself made clear that a state or locality could not demonstrate local discrimination simply by incorporating by reference a national study. See Croson, 488 U.S. at 504, 109 S.Ct. 706 ("If all a state or local government need do is find a congressional report on the subject to enact a set-aside program, the constraints of the Equal Protection Clause will, in effect, have been rendered a nullity."). It would thus appear to be impermissible for New York State to incorporate the federal USDOT definition of Hispanic without at least making an independent assessment of discrimination against Hispanics of Spanish origin in New York.
 
 
 42
 2. Applying Strict Scrutiny to Underinclusive Racial Definitions. The plaintiffs' claim could be construed alternatively as an argument that we should use strict scrutiny to evaluate the correctness of New York's chosen definition of "Hispanic." It is the view of the Supreme Court that "[r]acial classifications of any sort pose the risk of lasting harm to our society. They reinforce the belief, held by too many for too much of our history, that individuals should be judged by the color of their skin." Shaw, 509 U.S. at 657, 113 S.Ct. 2816.
 
 
 43
 It is uncontested by the parties that New York has identified a compelling governmental interest in remedying discrimination against Hispanics and that it has enacted a flexible minority contractor program that is narrowly tailored to further that interest. As the plaintiffs' challenge demonstrates, however, racial classifications may pass strict scrutiny and still appear arbitrary or unfair to persons classified as being within or without the chosen category. Whether or not the government's use of race ultimately survives strict scrutiny review, "whenever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." Adarand, 515 U.S. at 229-30, 115 S.Ct. 2097. "The application of strict scrutiny, in turn, determines whether a compelling governmental interest justifies the infliction of that injury." Id. at 230, 115 S.Ct. 2097. Strict scrutiny is applied in order to determine whether the harm stemming from a particular decision to use racial classifications is justified. But the fact that a particular governmental decision to use classifications based on race or national origin in a particular context passes strict scrutiny does not relieve those categories of their possible arbitrariness and unreliability as bases for classifying specific individuals.[7]
 
 
 44
 We therefore think that this version of the plaintiffs' argument misconceives the purpose behind the strict scrutiny test. "[S]trict scrutiny is designed to provide a framework for carefully examining the importance and the sincerity of the reasons advanced by the governmental decisionmaker for the use of race in that particular context." Grutter v. Bollinger, 539 U.S. 306, 327, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003). Once it has been established that the government is justified in resorting to the "highly suspect tool" of racial or national origin classifications, strict scrutiny has little utility in supervising the government's definition of its chosen categories. The purpose of the test is to ensure that the government's choice to use racial classifications is justified, not to ensure that the contours of the specific racial classification that the government chooses to use are in every particular correct.
 
 
 45
 Indeed, we find it difficult to imagine what a "correct" racial classification would be. It will always exclude persons who have individually suffered past discrimination and include those who have not. As the Eleventh Circuit has noted in rejecting a similar challenge:
 
 
 46
 The most troubling facet of defining a group who have been the victims of prior discrimination is the derivation of the definition itself. . . . Because of the irrationality of the definitional process underlying social stereotypes, it is equally vexatious to develop a definition, or to criticize one that has been developed, without resort to the same stereotypes which application of the definition seeks to eradicate.
 
 
 47
 Peightal II, 26 F.3d at 1561 n. 25; see also Fullilove v. Klutznick, 448 U.S. 448, 534 n. 5, 100 S.Ct. 2758, 65 L.Ed.2d 902 (Stevens, J., dissenting) ("[T]he very attempt to define with precision a beneficiary's qualifying racial characteristics is repugnant to our constitutional ideals."). Strict scrutiny cannot solve this problem. Rather, it ensures only that "`the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself.'" Grutter, 539 U.S. at 342, 123 S.Ct. 2325 (quoting Croson, 488 U.S. at 510, 109 S.Ct. 706 (plurality opinion)).
 
 
 48
 
 B. Using Underinclusiveness to Prove Discriminatory Intent
 
 
 
 49
 Our conclusion that it is inappropriate to review an affirmative action program's alleged underinclusiveness by automatically applying strict scrutiny does not foreclose the possibility that underinclusiveness may trigger strict scrutiny if it is motivated by a discriminatory purpose. To establish such a discriminatory purpose, in this case, though, it is not enough for the plaintiffs to demonstrate that Article 15-A was designed to benefit certain included groups of Hispanics and not others. They must show New York's intent to harm the groups of Hispanics that were excluded.
 
 
 50
 The State of New York would have had a discriminatory purpose if it had "selected or reaffirmed a particular course of action at least in part `because of,' not merely `in spite of' its adverse effects upon an identifiable group." Hayden, 180 F.3d at 50 (quoting Pers. Adm'r v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (emphasis in Hayden)). But to equate a "desire to eliminate the discriminatory impact" on some disadvantaged groups with "an intent to discriminate against" other groups "could seriously stifle attempts to remedy discrimination." Id. at 51. "Every antidiscrimination statute aimed at racial discrimination, and every enforcement measure taken under such a statute, reflect[s] a concern with race. That does not make such enactments or actions unlawful or automatically `suspect' under the Equal Protection Clause." Raso v. Lago, 135 F.3d 11, 16 (1st Cir.), cert. denied, 525 U.S. 811, 119 S.Ct. 44, 142 L.Ed.2d 34 (1998).
 
 
 51
 The Supreme Court applied rational basis, not strict scrutiny, review when it addressed a strikingly similar issue in Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). The plaintiffs in that case challenged Congress's decision to outlaw English literacy voting requirements for citizens instructed in a language other than English if those citizens were educated in "American-flag" schools, such as those in Puerto Rico, but not if they were educated in schools outside the jurisdiction of the United States. The Court noted that "[t]his is not a complaint that Congress, in enacting § 4(e), has unconstitutionally denied or diluted anyone's right to vote but rather that Congress violated the Constitution by not extending the relief . . . to those educated in non-American-flag schools." Id. at 656-57, 86 S.Ct. 1717. In addressing this allegation of underinclusiveness, the Court rejected strict scrutiny and applied rational basis review instead.
 
 
 52
 [I]n deciding the constitutional propriety of the limitations in such a reform measure we are guided by the familiar principles that a "statute is not invalid under the Constitution because it might have gone farther than it did," Roschen v. Ward, 279 U.S. 337, 339, 49 S.Ct. 336, 73 L.Ed. 722 [1929], that a legislature need not "strike at all evils at the same time." Semler v. Oregon State Board of Dental Examiners, 294 U.S. 608, 610, 55 S.Ct. 570, 79 L.Ed. 1086 [1935], and that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind," Williamson v. Lee Optical of Oklahoma Inc., 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 [1955].
 
 
 53
 Id. at 657, 86 S.Ct. 1717. We think that similarly, in an affirmative action program, "[t]he Equal Protection Clause does not require a state actor to grant preference to all ethnic groups solely because it grants preference to one or more groups." Peightal I, 940 F.2d at 1409 (Brown, J., concurring).
 
 
 54
 Underinclusive remedial measures are doubtless open to constitutional attack when they are irrational or motivated by a discriminatory purpose. In Arlington Heights, the Supreme Court laid out a nonexhaustive list of factors that could constitute circumstantial evidence of such a discriminatory purpose. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555. "Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action. . . ." Id. In addition, "[t]he historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." Id. at 267, 97 S.Ct. 555. "The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." Id. "Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." Id. "The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." Id. at 268, 97 S.Ct. 555. In addition to the factors listed in Arlington Heights, a statute's underinclusiveness may also be probative evidence of a discriminatory intent if it is "so woefully underinclusive as to render belief in that purpose a challenge to the credulous." Republican Party of Minn. v. White, 536 U.S. 765, 780, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002).
 
 
 55
 In Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), the Supreme Court concluded that a statute prohibiting certain types of animal slaughter contained so many exemptions for non-religious killings that it could be explained only by discriminatory animus against the Santeria Church, which engaged in ritual animal sacrifice. Although the city proffered a governmental interest in protecting public health and preventing cruelty to animals, "the texts of the ordinances were gerrymandered with care to proscribe religious killings of animals but to exclude almost all secular killings." Id. at 542, 113 S.Ct. 2217. The Court concluded that "[t]he ordinances had as their object the suppression of religion." Id.
 
 
 56
 In this case, the plaintiffs point to nothing in the history of Article 15-A and its enforcement or the sequence of events leading up to its enactment that would support an inference of anti-Spanish animus. Without any indication of that sort of discriminatory purpose for the statute's exclusion of persons of Spanish descent, we evaluate the plaintiff's underinclusiveness claim using rational basis review.
 
 
 57
 IV. Evaluating the Plaintiffs' Claim Under Rational Basis Review
 
 
 58
 The plaintiffs provide three reasons why, they contend, there is no rational, non-discriminatory reason to treat persons of Spanish national origin differently than other Hispanics.
 
 
 59
 First, the plaintiffs cite judicial opinions, federal statutes, and federal regulations declaring that Hispanics in general have suffered discrimination. See Soberal-Perez v. Heckler, 717 F.2d 36, 41 (2d Cir.1983), cert. denied, 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984) (finding that Hispanics constitute a suspect class); 15 U.S.C. § 637(d)(3)(C), Pub.L. No. 105-178 § 1101(b) (declaring that Hispanics are presumptively socially and economically disadvantaged for purposes of the Small Business Act). But these sources do not answer the more particular question of whether Spanish persons suffer the same kind and degree of discrimination as Hispanics included within New York's definition of the term.[8]
 
 
 60
 In response to comments on its notice of proposed rulemaking, the USDOT decided to include persons of Spanish and Portuguese origin within its definition of "Hispanic." See 46 Fed.Reg. 60458 (Dec. 10, 1981). We of course express no opinion as to whether, under Adarand, the Department had a sound basis in evidence for this decision to survive strict scrutiny, an issue not remotely before us. We also do not resolve whether, under Croson, New York could have adopted the Department's definitions without making a more specific study of discrimination against persons of Spanish ancestry in New York. In any event, it was not irrational, nor did it necessarily display animus toward persons of Spanish or Portuguese ancestry, for New York to focus on remedying discrimination against the ethnic sub-group of persons from Latin America rather than all those "who may speak English with an accent, whose names are recognizably Hispanic, or whose culture is recognizably Hispanic." See Definition of `Hispanic' in Department of Transportation Minority Business Enterprise Regulation, 46 Fed. Reg. 969, 970 (Jan. 5, 1981); see also Marinelli Constr. Corp. v. State, 200 A.D.2d 294, 297, 613 N.Y.S.2d 1000, 1002 (3d Dep't 1994) (upholding DMWBD's denial of MBE status to the plaintiff because, despite applicant's Spanish sur-name, his parents "were not Hispanics, but Italians, residing in Argentina").
 
 
 61
 Second, the plaintiffs provide anecdotal evidence of Luiere's own experience of discrimination on the basis of his Spanish ancestry. We express no view as to whether such anecdotal accounts, standing alone, could satisfy Croson's demands for a "strong basis in evidence" that would justify the inclusion of a particular class in an affirmative action program. But cf. Concrete Works, Inc. v. City & County of Denver, 36 F.3d 1513, 1520 (10th Cir.1994) (stating that "selective anecdotal evidence about minority contractor's experiences, without more, would not provide a strong basis in evidence to demonstrate public or private discrimination . . . sufficient to pass constitutional muster under Croson"),. cert. denied, 514 U.S. 1004, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995). It is clear in any event that the existence of evidence that might establish the existence of discrimination against one person, Luiere, on account of his national origin does not render New York's legislative choice differentiating between Spanish and Portuguese descendants and other Hispanics irrational. Under rational basis review, "[t]he legislature may select one phase of one field and apply a remedy there, neglecting the others." Williamson v. Lee Optical of Okla., 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955).
 
 
 62
 Third, the plaintiffs assert that New York's "Opportunity Denied!" study, referred to above, itself included Spanish descendants in its data on Hispanics. In particular, the study relied on Census Bureau information on Hispanics, including persons of Spanish descent in its calculations. The defendants concede that the "[p]laintiffs may well be correct that some of the information collected for the Study did not differentiate between persons of Spanish descent and Hispanics," and that "the Study may have scrutinized some faulty data that included Jana-Rock in the pool of Hispanic MBEs." Appellees' Br. at 38.
 
 
 63
 It does not follow, however, as the plaintiffs seem to contend, that because the study found discrimination against Hispanics as a group to be prevalent, it also found that there was significant discrimination against the sub-group of Hispanics who are of Spanish descent. In the 1980 census — which provided the data for "Opportunity Denied!" — only 0.6% of persons who identified themselves as "Hispanic" also identified themselves as "Spaniard." See U.S. Census Bureau, Ancestry of the Population by State: 1980 at 14 tbl.2 (1983), available at http://www.census.gov/population/censusdata/pc80-s1-10/pc80-s1-10.pdf (last visited, Feb. 20, 2006). Whether or not this ratio of nearly 200 to 1 would provide a strong basis for rendering a conclusion as to the extent of discrimination against persons of Spanish descent, it was not irrational for New York to conclude that Hispanics of Latin American origin were in greater need of remedial legislation.
 
 CONCLUSION
 
 64
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 
 
 Notes:
 
 
 [1]
 The classifications that are the subject of this appeal are based on national origin rather than race. It is undisputed, however, that principles of analysis applicable to race-based affirmative action programs are the same as those applicable to national-origin-based affirmative action programs. We therefore use the terms interchangeablySee United States v. Virginia, 518 U.S. 515, 532 n. 6, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (noting that "[t]he Court has thus far reserved most stringent judicial scrutiny for classifications based on race or national origin"). Adarand itself made no distinction between the two categories. Indeed, the company that was the beneficiary of the affirmative action program involved in Adarand may well have been owned by a Hispanic person. See Adarand, 515 U.S. at 205, 115 S.Ct. 2097.
 
 
 [2]
 We note that the statutory definition appears to be missing a noun after the words "South American."
 
 
 [3]
 To recapitulate, over a period of more than ten years, the New York State agencies that were involved in the certification of Luiere and Jana-Rock as a minority or minority-owned business were: the New York State Department of Transportation (N.Y.DOT); the New York Governor's State Office of Minority and Women's Business Development (OMWBD); and the Division of Minority and Women's Business Development (DMWBD)
 
 
 [4]
 See footnote 1, supra.
 
 
 [5]
 We note that some statements, in dicta, of one of our sister circuits may lend support to the view that underinclusiveness should be included in the narrow-tailoring analysis. In addition to the factors derived fromParadise, the Federal Circuit has stated that in judging narrow tailoring a court should consider "the overinclusiveness or underinclusiveness of the racial classification." Rothe Dev. Corp. v. U.S. Dept. of Def., 262 F.3d 1306, 1331 (Fed.Cir. 2001). In support of this additional factor, the Federal Circuit cited Croson, which, it noted parenthetically, "includ[ed] over-and under-inclusiveness in the narrow tailoring factors." Id. But on our reading of Croson we cannot find any examples of the Supreme Court evaluating underinclusiveness in that opinion. Indeed, such an inquiry would have been in tension with Croson's holding that affirmative action programs can be no broader than demonstrably necessary. We also note that the Federal Circuit itself does not appear to have used underinclusiveness as a basis for criticizing the federal affirmative action program it was examining in the Rothe decision.
 Support for using underinclusiveness as part of narrow tailoring may also be found in Justice O'Connor's dissenting opinion in Metro Broadcasting, Inc. v. FCC, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990). That dissent criticized the FCC's decision to use race as a proxy for under-represented views in the media. Justice O'Connor noted that "[t]he policy is underinclusive: It awards no preference to disfavored individuals who may be particularly well versed in and committed to presenting those views." Id. at 621, 110 S.Ct. 2997 (O'Connor, J., dissenting). But this analysis was designed to support her argument that in seeking diverse viewpoints, the FCC had "impermissibly use[d] race and ethnicity as a proxy for other, more germane bases of classification." Id. (internal quotation marks omitted); cf. Johnson, 125 S.Ct. at 1156-57 ("Race is an unreliable and necessarily underinclusive predictor of violence.")
 We confront a different situation. For purposes of this appeal, New York has already demonstrated the compelling need to rely on such a "highly suspect tool" in order to remedy racial discrimination. As explained below, every racial classification will necessarily be overinclusive and underinclusive in some respects. The analysis in the Metro Broadcasting dissent is more appropriately directed to the question of whether the government is justified in its initial decision to use racial classifications at all — not in supervising which racial groups the government chooses to include in its remedial program.
 
 
 [6]
 It may be worth noting that courts do test for underinclusiveness when they evaluate a regulation ofspeech under strict scrutiny. But in the context of the First Amendment, testing for underinclusiveness reflects our concern that "an exemption from an otherwise permissible regulation of speech may represent a governmental `attempt to give one side of a debatable public question an advantage in expressing its views to the people.'" City of Ladue v. Gilleo, 512 U.S. 43, 51, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (quoting First Nat. Bank of Boston v. Bellotti, 435 U.S. 765, 785-86, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)). "[T]hrough the combined operation of a general speech restriction and its exemptions, the government might seek to select the `permissible subjects for public debate' and thereby to `control . . . the search for political truth.'" Id. (quoting Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 530, 538, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980)).
 These concerns are inapposite with respect to strict scrutiny of racial classifications because such classifications are no less stigmatic if they are applied in a balanced or symmetrical fashion. "It is axiomatic that racial classifications do not become legitimate on the assumption that all persons suffer them in equal degree." Powers v. Ohio, 499 U.S. 400, 410, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (citation omitted).
 
 
 [7]
 Cf. Office of Management and Budget, Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity, 62 Fed. Reg. 58782 (1997) (stating that federal racial classifications "represent a social-political construct designed for collecting data on the race and ethnicity of broad population groups in this country, and are not anthropologically or scientifically based").
 
 
 [8]
 Whether or not they do suffer comparable levels of discrimination is, of course, not before us. We neither express nor mean to imply any view on the question